Filed 2/28/14; part. pub. order 4/1/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| CALIFORNIA CLEAN ENERGY COMMITTEE, | |
| Plaintiff and Appellant, | C072033 |
| v. | (Super. Ct. No. CVPT112146) |
| CITY OF WOODLAND, | |
| Defendant and Appellant; | |
| PETROVICH DEVELOPMENT COMPANY, LLC, et al., | |
| Real Parties in Interest and Respondents. | |

The City of Woodland (City) approved Gateway II –- a project by Petrovich Development Company, LLC (Petrovich) to develop a 234-acre regional shopping center on undeveloped agricultural land located at the City's periphery. California Clean Energy Committee (CCEC), a California nonprofit organization, filed a petition for writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Resources

1

Code, §§ 21050 et seq.) to challenge the City's certification of its final environmental impact report (final EIR) and approval of the project.[1]  The City opposed the petition, which was denied in its entirety by the trial court.

CCEC appeals, contending (1) the trial court erred in concluding Gateway II did not conflict with the City's general plan, (2) the City's mitigation measures are insufficient to ameliorate the urban decay that will be caused by Gateway II, (3) the City did not give meaningful consideration to feasible project alternatives such as the mixed-use alternative, and (4) the final EIR did not properly identify and analyze potentially significant energy impacts generated by Gateway II.

The City asserts claims regarding conflicts between Gateway II and the general plan are not cognizable because CCEC did not comply with the statute of limitations imposed by the planning and zoning law (Gov. Code, § 65000 et seq.).  The City additionally asserts CCEC failed to present the CEQA issues in the trial court or during the administrative process.  The City further argues it properly considered each of the other issues raised by CCEC but rejected them as it is allowed to do under CEQA.  And, the City asserts it committed to implementing mitigation measures sufficient to ameliorate urban decay expected to result from Gateway II.

The City also cross-appeals, contending the trial court erroneously granted CCEC's motion to tax costs.  Specifically, the City claims it should have received its costs for helping prepare the administrative record.  CCEC responds that a public agency cannot recover costs when the CEQA petitioner has elected to prepare the record.

---

[1]     Undesignated statutory references are to the Public Resources Code.  References to guidelines are to those located in California Code of Regulations, title 14, section 15000 and following (Guidelines).  These Guidelines are promulgated by the secretary of the California Resources Agency to implement CEQA requirements.  (§ 21083, subd. (e); *Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1161, fn. 1 (*Center for Sierra Nevada Conservation*).)

We conclude CCEC's petition in the trial court did not assert a cause of action arising under the planning and zoning law. Consequently, CCEC has not preserved the issue of whether the rezoning of the land for Gateway II conflicts with the City's general plan.[2]

On the merits, we conclude the City's mitigation measures for alleviating the anticipated urban decay in its downtown and at a local shopping mall are inadequate under CEQA. Although one of the five mitigation measures is likely to lessen the effects of urban decay, even the City recognizes it alone does not constitute sufficient mitigation. The remaining urban decay mitigation measures are too speculative, vague, or noncommittal to comply with CEQA. As to the City's consideration of project alternatives, we conclude the EIRs did not properly assess the merits of the mixed-use alternative. On the issue of energy impacts, we conclude CEQA required the City to assess transportation, construction, and operation energy impacts resulting from Gateway II. The City's reliance on the California Building Standards Code (Cal. Code Regs., tit. 24, part 6) (Building Code) and California Green Building Standards Code (Cal. Code Regs., tit. 24, part 11) (CALGreen) did not suffice to address issues of transportation, construction, and operation energy impacts.

Our conclusion that the judgment must be reversed obviates our need to consider the City's issue on cross-appeal, which depends on the City being the prevailing party on the CEQA claims.

---

**2** However, the City's additional assertions of forfeiture of the CEQA issues are troubling because they are contradicted by the record. In a case in which the appellate record consists of 18,010 pages, claims regarding failure to assert a point during the EIR process should be more carefully presented.

3

BACKGROUND

### *The City's General Plan*

The City adopted its general plan in December 2002. In it, the City announced it intended "[t]o revitalize the Downtown district as the heart of the city. [¶] With a stock of historic buildings that tie the community to its past, Downtown is the center of community activity and a primary source of Woodland's identity. The General Plan seeks to preserve Downtown's central location and its function as a center for community activities by continuing the City's revitalization efforts and considering the effects of other land use decisions on Downtown vitality."

### *The Gateway II Project*

The first phase of the development (Gateway I) was approved in 2006 and involved Petrovich's development of 49 acres of agricultural land for retail and commercial uses on the edge of the City –- near the intersection of Interstate Highway 5 (I-5) and Yolo County Road 102. Gateway I was completed and began leasing when Petrovich submitted a plan to the City for development of the next phase of the project (Gateway II). In February 2007, Petrovich filed an application with the City to annex approximately 154 acres of farmland to the City and to rezone the acreage from "Agricultural" to "General Commercial."

### *The Draft EIR*

In October 2009, the City issued a notice of preparation that an EIR would be prepared for the proposed Gateway II project. A draft EIR was published in April 2010. The draft EIR described the scope of the project as a regional commercial center with approximately 808,000 square feet of retail space, 3 hotels with 100 rooms each, a 20,000 square foot sit-down restaurant, 3 fast food restaurants with a cumulative 30,500 square feet of space, an 80,000 square foot auto mall, and 100,000 square feet of office space.

The draft EIR studied Gateway II's anticipated impact on retail in surrounding areas. Based on "the super-regional retail center size of Woodland Gateway Phase I and

4

Phase II," the draft EIR expected the project would "include customers from Woodland, Davis, Dixon, North Natomas, Greenbriar Specific Plan area, Colusa County, and unincorporated portions of Yolo County (including UC Davis and Winters)." Because "the specific tenant mix is unknown," the draft EIR "evaluate[d] the retail trade area's ability to support the overall amount of retail rather than specific classes of retail goods."

The analysis divided its assessment of impacts into "two time periods based on projected market demand." According to the draft EIR, "The phasing approach allows for the Project to minimize the potential for urban decay. [¶] —- The first time period is based on estimated market demand in 2015. This phase includes the first 295,000 square feet of retail development and half of the auto mall (two dealerships). It is anticipated this first phase will be completed by 2015. [¶] —- The second time period includes the cumulative project absorption through 2025. The second phase of development, anticipated to be completed no earlier than 2025, will include the remaining 545,000 square feet of retail development, 100,000 square feet of office, hotels, and remaining auto dealership site."

URBAN DECAY

The draft EIR engaged in "an assessment of the potential for the Project to cause urban decay." To this end, the draft EIR explained that "the project must be considered in connection with the effects of other current projects, and the effects of probable future projects. For example, impacts related to the physical deterioration and urban decay of Downtown Woodland, East of Downtown, and East of I-5." The draft EIR noted, "urban decay impacts are cumulative by nature."

The draft EIR concluded Gateway II could threaten the economic health and physical integrity of the City's downtown in the near term: "Downtown Woodland . . . could be directly vulnerable to a loss of sales and increased vacancies. While Project tenants will not compete directly with Downtown retailers, a lack of overall demand for additional retail may make it financially infeasible for public or private investors to make

5

the needed capital improvements to support additional retail suited for Downtown. The development of [Gateway II] may hinder efforts to revitalize downtown in the short term. [¶] Over the long-term however, it is anticipated that downtown could benefit from the Project. As envisioned, the Project will accommodate auto dealers currently inhabiting key redevelopment sites in downtown. In addition, the Project has the potential to increase the number of shoppers to Woodland through increased capture of regional sales activity, providing downtown with the opportunity to capture a portion of these additional shoppers. Finally, the Project will generate additional General Fund revenues to support enhanced municipal service and potential investment in downtown."

MIXED-USE ALTERNATIVE

In addition to the proposed project, the draft EIR also considered a mixed-use alternative, which "would include development of less acreage (approximately 60 percent or 93 acres) than the proposed project. The Mixed Use Alternative would still include an annexation of 154 acres from Yolo County to the City of Woodland. The 93 acres would be prezoned General Commercial (C-2) with a Planned Development Overlay to allow the mixed use nature of the alternative. The remaining acreage would be prezoned to a new zoning designation of Urban Reserve consistent with the General Plan. The southern and eastern portion of the property would remain in the existing condition, and would act as a buffer between the project and the [Woodland Water Pollution Control Facility] located to the east of the site, and agricultural uses to the south of the site. Development of this alternative would include a five-acre site for a 100-unit multi-family development at approximately 20 units per acre. In addition, the commercial portion of the development would include a local-serving commercial town center (with approximately 50 residential units located above the center) to enhance a sense of community among residents. The commercial portion of the development would include approximately 200,000 square feet (including restaurants) and two auto dealerships. Development under

6

the Mixed-Use Alternative would be designed to be consistent with SmartGrowth principles."**3**

The draft EIR rejected the mixed-use alternative as infeasible. As to this alternative, the draft EIR states that "[t]he Mixed Use Alternative would decrease the development of roadways, driveway, and parking areas, as compared to the proposed project. . . . Transportation and circulation impacts are directly related to land development activities. The Mixed Use Alternative would reduce the commercial trips generated by the proposed project; however, would result in increased trips associated with the proposed residential uses. Therefore, it is *assumed* that the transportation and circulation impacts of the Mixed Use Alternative would be similar to the proposed project." (Italics added.)

ENERGY ANALYSIS

The draft EIR addressed the energy impact of Gateway II by determining the national "average annual usage of electricity is roughly 13 kWh/square foot and the average annual usage of natural gas is roughly 37 cubic feet/square foot for commercial buildings." These national averages were multiplied by the number of square feet expected for Gateway II at full buildout. Thus, the draft EIR stated Gateway II "would be expected to produce a demand for 10,504,000 kWh of electricity annually and 29,896,000 cubic feet of natural gas annually."

The draft EIR noted any new commercial construction would be subject to "[Building Code] energy conservation requirements . . . for non-residential buildings." The draft EIR also noted that "a substation, multiple utility lines (60 kV, 115 kV, and 230 kV), and gas transmission lines exist in the area" to provide power to Gateway II. The draft EIR also found the project would generate 40,051 new vehicle trips each day. Of

---

**3** The draft EIR does not define "SmartGrowth principles."

7

these, approximately 40 percent would be regional in nature with "much longer trip lengths than the standard for City of Woodland retail shopping trips."

Ultimately, the draft EIR concluded Gateway II "would be expected to have a *less-than-significant* impact regarding the wasteful, inefficient, or unnecessary consumption of energy" and required no mitigation measures.

### *The Final EIR*

The final EIR was published in June 2011. Regarding the issues raised in this appeal, the final EIR essentially reiterated the findings and conclusions set forth in the draft EIR for the Gateway II project.

### URBAN DECAY

The final EIR reworded language of the mitigation measures for addressing the impact on urban decay expected for the project. For example, the final EIR revised Mitigation Measure 4.11-3(a), as follows: "The City shall ~~consider~~ co[o]rdinat~~e~~ing with the current owner of the County Fair Mall to consider a strategic land use plan for the County Fair Mall to analyze potential viable land uses for the site." An explanatory note following the revised text for the urban decay mitigation measures states, "The above change is for clarification purposes only and does not alter the conclusions in the Draft EIR."

### MIXED-USE ALTERNATIVE

The final EIR reiterated the conclusions about the economic infeasibility of the mixed-use alternative as set forth in the draft EIR. Specifically, the final EIR again concluded the mixed-use alternative would fail to "better capture leakage of sales from uses not already served within the community" or to "develop revenue generating land uses to provide jobs."

### ENERGY ANALYSIS

On the issue of "[i]ncreased demand for energy and impacts concerning wasteful, inefficient, or unnecessary consumption of energy by commercial uses," the final EIR

8

concluded no mitigation measures were required because the project would have less than significant impacts. The final EIR elaborates: "Increased demand for energy and impacts concerning wasteful, inefficient, or unnecessary consumption of energy by commercial uses is discussed in impact statement 4.10-7, page 4.10-29 of the Draft EIR, Chapter 4.10, Public Services and Utilities. The Draft EIR determined that project would be required to comply with or exceed Title 24 guidelines and regulations. Therefore, the project would be expected to have a less-than-significant impact regarding the wasteful, inefficient, or unnecessary consumption of energy."

### *City Approval of Gateway II*

In September 2011, the Woodland City Council voted three-to-two to: certify the final EIR, approve Petrovich's application for annexation, pre-zone the project site to 61.3 acres designated general commercial, and amend the general plan. In approving the project, the City reduced Gateway II to 61.3 acres and no more than 340,000 square feet of commercial space.

## URBAN DECAY

As part of its project approval, the City adopted Resolution 6029 (Resolution). The Resolution acknowledges Gateway II will have a deleterious effect on the City's downtown. Specifically, the Resolution states that "[i]mplementation of the proposed project *would result* in physical deterioration and urban decay of retail centers in Downtown Woodland, East of Downtown, and East of I-5." (Italics added.) Supporting this finding, the City found that "[t]he proposed project could attract new consumers to the City of Woodland and minimize impacts to existing big box retailers. However, should existing big box retailers relocate to the proposed project, re-leasing of the vacant big box could be difficult, and urban decay could occur in the entire shopping center. In addition, excess of retail space (supply) would slow the revitalization of Downtown Woodland. As stated above, development of partial buildout of the proposed project would result in short-term excess retail space (supply) and long-term retail leakage."

9

Despite the findings regarding downtown urban decay, the City approved the project and noted "that (l) changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen the significant environmental effects identified above and (2) specific economic legal, social, technological, or other considerations make infeasible certain mitigation measures or alternatives identified in the Final EIR."  To ameliorate the effects of urban decay, the Resolution stated the urban decay mitigation measures set forth in the draft and final EIRs would be required.

MIXED-USE ALTERNATIVE

In contrast to the rationale of *economic* infeasibility set forth in the EIRs, the Woodland City Council rejected the mixed-use alternative on grounds it "would have greater *environmental* impacts than the proposed project.  (State CEQA Guidelines § 15126.6(c).)"  (Italics added.)  As further explanation, the Resolution stated:  "The Mixed-Use Alternative would result in greater public services and utilities impacts, as compared to the proposed project.  Impacts to land use and agricultural resources, biological resources, and hydrology and water quality would be fewer, as compared to the proposed project.  All other impacts would be equal to those of the proposed project.  Because the Mixed-Use Alternative would, overall, result in greater impacts than the proposed project, the Alternative is considered infeasible."

ENERGY CONSERVATION

The Resolution did not mention the energy considerations set forth in the draft and final EIRs under section 4.10-7, which required compliance with building codes to achieve energy efficiency.  Thus, no mitigation measures were adopted to address transportation, construction, or operation energy impacts for Gateway II.

*CCEC's Petition for Writ of Mandate in Superior Court*

In September 2011, CCEC filed a petition for writ of mandate in superior court to challenge the City's certification of the final EIR and its approval of the project.  In July

10

2012, the trial court denied the petition in its entirety. CCEC timely filed a notice of appeal from the judgment.

In September 2012, the trial court awarded costs to the City, with the exception of the City's request for $6,896.40 related to City staff and consultant time spent in helping to prepare the administrative record.[4] The City has timely filed a notice of appeal from the post-judgment order awarding costs to the City.

## CEQA OVERVIEW

The basic principles of CEQA are by now familiar and well settled. " '[T]he purpose of CEQA is to protect and maintain California's environmental quality. With certain exceptions, CEQA requires public agencies to prepare an EIR for any project they intend to carry out or approve whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental effect. . . .' (*Communities for a Better Environment v. California Resources Agency* [(2002) 103 Cal.App.4th 98], 106-107, fns. omitted.) The California Supreme Court has 'repeatedly recognized that the EIR is the "heart of CEQA." [Citations.] "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' " ' " (*Center for Sierra Nevada Conservation, supra,* 202 Cal.App.4th at p. 1169, quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123; fn. omitted.)

To comply with CEQA, "[p]ublic agencies must 'prepare, or cause to be prepared by contract, and certify the completion of, an [EIR] on any project that they intend to

---

**4** The trial court did not calculate the total costs it awarded to the City. Instead, it noted amounts it was deducting from the request for costs. Even on cross-appeal, the City does not assert what it was actually awarded by the trial court. Given our conclusion that reversal of the judgment on CCEC's appeal obviates the need to consider the issue on cross-appeal, we do not need to calculate the actual amount of costs awarded.

11

carry out or approve which may have a significant effect on the environment.' (§ 21151, subd. (a).) Section 21065 defines 'project' to include 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] . . . [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.' The Guidelines further define project as 'the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [¶] . . . [¶] (3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.' (Guidelines, § 15378, subd. (a)(3).) Under CEQA, ' " 'Project' is given a broad interpretation . . . to maximize protection of the environment." ' " (*Center for Sierra Nevada Conservation, supra*, at pp. 1169–1170, quoting *Riverwatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1203.)

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (. . . § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427 (*Vineyard*), fns. omitted.) "Judicial review of these two types of error differs significantly: while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or

12

more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Id*. at p. 435.) "A public agency's decision to certify the EIR is presumed correct, and the challenger has the burden of proving the EIR is legally inadequate." (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1545–1546, citing *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 (*Save Our Peninsula*).)

In a CEQA case, we review the lead agency's action rather than the trial court's subsequent decision. Accordingly, we "resolve the substantive CEQA issues on [appeal] by independently determining whether the administrative record demonstrates any legal error by the [lead agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Vineyard, supra*, 40 Cal.4th at p. 427.) Consistent with these principles of review, we proceed to consider CCEC's contentions.

APPEAL BY CCEC

**I**

***Whether the Project Conflicts with the City's General Plan Goals of Preserving an Economically Viable Downtown***

CCEC contends the City violated the requirements set forth in its general plan by approving Gateway II after finding it would cause urban decay in the City's downtown. The City responds that the issue has not been preserved for review to the extent it arises under the planning and zoning law. Insofar as the claim arises under CEQA, the City argues part of the claim was not presented during the EIR process, and it fully complied with CEQA requirements. We conclude the issue of urban decay is cognizable only to the extent it arises under CEQA.

The City approved the annexation of the Gateway II acreage and its zoning change on September 20, 2011. The City asserts that "[t]he statute of limitations under the State Planning and Zoning Law therefore expired on December 19, 2011." With this assertion,

13

we have no quarrel because Government Code section 65009, subdivision (c), provides that for a challenge to a land-use zoning change "no action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 90 days after the legislative body's decision:  [¶]  (A) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a general or specific plan."

However, CCEC filed its petition for writ of mandate in superior court within the 90-day window –- specifically, within two days after the City's zoning action.  On this point, the City argues CCEC did not actually present the planning and zoning law cause of action in its petition.  The City acknowledges CCEC presented CEQA causes of action and "the Petition alleges the Gateway II project was inconsistent with the City's General Plan."  Nonetheless, the City asserts the zoning claim was not properly presented because the petition did not present the issue as "a separate cause of action" or "alert the City to the allegation that the State Planning and Zoning law had been violated."

CCEC's petition does contain the factual allegation that "a project such as this one with significant and unmitigated decay impacts that would positively degrade the downtown is not consistent with the General Plan."  However, CCEC's petition is titled, "Petition for writ of mandate pursuant to the Environmental Quality Act."  Each of the three causes of action expressly states a CEQA violation by the City for (1) erroneously certifying a deficient EIR, (2) making findings in support of the project without sufficient evidence, and (3) failing to recirculate the final EIR to correct its deficiencies.  For these CEQA violations, CCEC requested relief in the form of setting aside the final EIR, injunctions preventing construction on the project, and a declaration that the City must comply with CEQA's EIR requirements before proceeding, and costs of suit.

CCEC's petition is thoroughly steeped in CEQA and does not mention the planning and zoning law.  Moreover, the petition requests no relief in the form of rezoning or nullifying the City's action to amend the general plan to annex the acreage

14

for Gateway II.  We agree with the City that the petition failed to alert it that CCEC challenged its actions under the planning and zoning law.

"Generally speaking, '[t]he complaint in a civil action serves a variety of purposes [citation], of which two are relevant here:  it serves to frame and limit the issues [citation] and to apprise the defendant of the basis upon which the plaintiff is seeking recovery [citations].  In fulfilling this function, the complaint should set forth the ultimate facts constituting the cause of action, not the evidence by which plaintiff proposes to prove those facts.'  (*Committee On Children's Television, Inc. v. General Foods Corp*. (1983) 35 Cal.3d 197, 211–212.)  [¶]  By framing and limiting the issues, the complaint limits the bases upon which a plaintiff may seek to impose liability on a defendant."  (*Centex Homes v. Superior Court* (2013) 214 Cal.App.4th 1090, 1102.)  Even though this case involves a petition rather than a complaint, the City is likewise entitled to be alerted to the basis upon which petitioner CCEC seeks the relief for which it prays.  CCEC did not plead any planning and zoning law violation in a manner that might have fairly apprised the City of this legal theory for relief.

Accordingly, we conclude the claim is not cognizable insofar as it arises under the planning and zoning law.  Given the CEQA claim has been preserved but the planning and zoning law issue forfeited, the scope of our review is limited to whether the City's study and mitigation of urban decay complied with CEQA.

## II

### *Whether the City's Urban Decay Mitigation Measures Comply with CEQA*

In addition to challenging Gateway II on grounds it conflicts with the City's general plan, CCEC argues Mitigation Measures 4.11-2(a) through (d) and 4.11-3(a) do not satisfy CEQA requirements.  We conclude the City's urban decay mitigation measures are inadequate under CEQA.

15

## A.

### *CEQA Encompasses Urban Decay Considerations*

Under CEQA, a lead agency must address the issue of urban decay in an EIR when a fair argument can be made that the proposed project will adversely affect the physical environment. "An EIR is to disclose and analyze the direct and the reasonably foreseeable indirect *environmental* impacts of a proposed project if they are significant. (Guidelines, §§ 15126.2, 15064, subd. (d)(3).)[5] Economic and social impacts of proposed projects, therefore, are outside CEQA's purview. When there is evidence, however, that economic and social effects caused by a project, such as a shopping center, could result in a reasonably foreseeable indirect environmental impact, such as urban decay or deterioration, then the CEQA lead agency is obligated to assess this indirect environmental impact." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1182 (*Anderson First*).)

When a project will result in an adverse change to the physical environment, CEQA instructs that "the agency 'shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures' (§ 21081.6, subd. (b)) and must adopt a monitoring program to ensure that the mitigation measures are implemented (§ 21081.6, subd. (a)). *The purpose of these requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then*

---

[5]     Guidelines section 15126.2, subdivision (a), provides in pertinent part: "Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects."

Guidelines section 15064, subdivision (d), requires that both primary and "reasonably foreseeable" secondary consequences be considered in determining the significance of a project's environmental effect.

*neglected or disregarded.*  (See § 21002.1, subd. (b).)”  (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1260-1261, fn. omitted.)

## B.

### *The City's Urban Decay Mitigation Measures*

The issue of urban decay in the City's downtown and existing retail areas was studied in the draft EIR and its conclusions were reiterated in the final EIR.  In the draft EIR, the City recognized that if "existing big box retailers relocate to the proposed project, re-leasing of the vacant big box could be difficult, and urban decay could occur in the entire shopping center.  In addition, excess of retail space (supply) would slow the revitalization of Downtown Woodland. . . .  [D]evelopment of partial buildout of the proposed project would result in short-term excess retail space (supply) and long-term retail leakage."  To ameliorate the urban decay expected to be caused by Gateway II, the city council imposed the following five mitigation measures to combat urban blight downtown and at the County Fair Mall:

Mitigation Measure 4.11-2(a):  At the time of future applications for site-specific development, the project applicant shall submit a request to the Community Development Department for a Master Conditional Use Permit (CUP), which must include a site plan and architectural review, as well as create design standards for alternative transportation, pedestrian and bicycling access, site plans, and architecture review.  The Master CUP shall comply with the draft EIR for the project, and will be evaluated at the time of the request to determine if further environmental review is necessary [for the] list of specific project uses for review and approval by the Community Development Department.  The Master CUP shall indicate that the list of specific project uses shall primarily consist of regional retail uses that do not include entertainment uses and other uses that would compete with retail in Downtown Woodland.

17

Mitigation Measure 4.11-2(b): At the time of future applications for site-specific development, the project applicant shall submit a market study for and urban decay analysis, including hotels if proposed, for review and approval by the Community Development Department. The market study and urban decay analysis shall show that adequate retail demand exists for the proposed uses and that urban decay would not occur as a result of the proposed phase of the project. If the market study and urban decay analysis show inadequate demand, then the City shall evaluate the impacts of the use proposed for development and either require additional mitigation or require an alternate use.

Mitigation Measure 4.11-2(c): Prior to the issuance of building permits, the project applicant shall contribute funds toward the development of a Retail Strategic Plan. The amount of the fee shall be determined in the Development Agreement between the City and the project applicant. The City would be responsible for preparing a Retail Strategic Plan which shall determine what retail areas shall be preserved as retail and which areas shall be developed as other uses, helping to identify repositioning strategies for those underperforming centers.

Mitigation Measure 4.11-2(d): Prior to the issuance of building permits, the project applicant shall contribute funds toward the preparation of an Implementation Strategy for the Downtown Specific Plan. The amount of the fee shall be determined in the Development Agreement between the City and the project applicant. The City would be responsible for preparing the Implementation Strategy which, among other things, can help define the strategies for progressing the civic and entertainment focus of downtown.

To address urban blight at the County Fair Mall, Mitigation Measure 4.11-3(a) requires the City to "coordinate with the current owner of the County Fair Mall to prepare a strategic land use plan for the County Fair Mall to analyze potential viable land uses for the site." However, even with "[i]mplementation of Mitigation Measures 4.11-3(a) and 4.11-3(b) [to] reduce the intensity and delay urban decay to retail in County Center Mall,

18

West Woodland, and East Street Corridor," the City still anticipated that "this impact would remain significant and unavoidable."

## C.

### *Preservation of the Issue for Review*

Before turning to the individual mitigation measures adopted to combat urban decay, we address the City's contention that CCEC failed to preserve the issue by raising it in the trial court. The City's contention misreads the record.

Ordinarily, we do not consider issues raised for the first time on appeal. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394.) In arguing CCEC failed to raise the issue of urban decay in the trial court, the City cites the portion of CCEC's petition that alleges claims under CEQA. However, that same petition devoted nearly three pages to setting forth allegations regarding this issue under the rubric, "Urban Decay." Those pages clearly articulated the alleged inadequacies of the City's EIRs regarding urban decay and described how the mitigation measures fail to combat the problem. In short, the very document cited by the City dispels its claim of forfeiture.

In addition to arguing CCEC failed to raise the issue in the trial court, the City asserts CCEC did not challenge Mitigation Measure 4.11-2(a) during the EIR process. "In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency, and the person attacking the decision must have raised some objection during the administrative proceedings. (§ 21177, subds. (a), (b).)" (*Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 701.) Although an issue must first have been raised during the administrative process to be preserved for judicial review, it may be argued in court by a different person. (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 875.) Mitigation Measure 4.11-2(a) limits Gateway II to consisting "primarily" of regional retail usage that does not include civic, entertainment, or other uses that would compete with the downtown.

19

The City asserts CCEC failed to present the issue during the EIR process. We reject the assertion. Having reviewed the administrative record, we conclude specific objections to Mitigation Measure 4.11-2(a) were raised during the EIR process. For example, one City resident commented on the final EIR by objecting to "the inadequate and improper manner of mitigation analysis for serious impacts of urban decay caused by the revised project" and stated that an "inadequate aspect of this mitigation analysis related to urban decay involves an absence of any relevant specificity of the statement that commercial zoning within the revised project:  'will primarily consist of regional retail uses that do not include . . . uses that would compete with Downtown Woodland.' " Additionally, the final EIR itself notes CCEC comment:  "The mitigation proposed for urban decay is vague and unenforceable."  Accordingly, CCEC may challenge Mitigation Measure 4.11-2(a) because the issue has been preserved for our review.

## D.

### *Land Use Controls –- Mitigation Measure 4.11-2(a)*

In approving the project, the City adopted Mitigation Measure 4.11-2(a) to require Petrovich to submit "a site plan and architectural review, as well as create design standards for alternative transportation, pedestrian and bicycling access, site plans, and architecture review" when the developer is ready to build on specific sites within the project area. The developer's application –- along with the supporting documents –- are subject to "review and approval by the Community Development Department."  If the City issues a permit for the application, the permit "shall indicate that the list of specific project uses shall primarily consist of regional retail uses that do not include entertainment uses and other uses that would compete with retail in Downtown Woodland."

CCEC argues this mitigation measure is meaningless because even if "project uses shall *primarily* consist of regional retail uses," up to 49 percent of Gateway II may consist of uses directly competing with the City's downtown retail area.  To the extent

20

CCEC's argument relies on the conflict between land use for Gateway II and the City's 2002 general plan, it is forfeited for failure to timely present a claim under the planning and zoning law. (See part I, *ante*.) To the extent the argument arises under CEQA, we reject it on the merits.

Under CEQA, a project may be adopted even when it will have a significant and unavoidable adverse effect on the environment. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 260.) A lead agency may find the "unmitigated effects [to be] outweighed by the project's benefits." (*Ibid.;* Guidelines, § 15093.) And, each individual mitigation measure need not, by itself, be able to cure all significant impacts resulting from the project. (See, e.g., *California Oak Foundation v. Regents of University of California*, *supra*, 188 Cal.App.4th at p. 279 [adoption of "several mitigation measures and continuing best practices" were cumulatively sufficient to protect archaeological resources at the project sites].)

Mitigation Measure 4.11-2(a) serves to ensure that the primary retail uses for Gateway II will be regional, i.e., the type of retail that will not directly compete with the City's smaller downtown stores. This measure does not run afoul of CEQA because it does not outright ban all retail uses that compete with the City's downtown. There is no need to require mutually exclusive retail offerings in the City's downtown and at Gateway II. Indeed, such mutual exclusivity might not be possible since overlapping product offerings might not be avoidable. As to this mitigation measure, we accept the City's representation that it "merely found that this measure would help, albeit not enough to avoid the significant urban decay impact identified by the EIR." While Mitigation Measure 4.11-2(a) is permissible under CEQA, it does not, by itself, constitute adequate mitigation of anticipated urban decay as a result of Gateway II.

21

**E.**

*Future Market Studies –- Mitigation Measure 4.11-2(b)*

Mitigation Measure 4.11-2(b) requires Petrovich "[a]t the time of future applications for site-specific development," to "submit a market study for and urban decay analysis, including hotels if proposed, for review and approval by the Community Development Department." CCEC argues this measure conflicts with CEQA in four ways: (1) by "piecemealing" urban decay analysis, (2) by ceding responsibility for studying an environmental impact to the developer, (3) by delegating review and approval authority to the City's community development department, and (4) by failing to require specific mitigation actions to alleviate urban decay. We agree with the second and fourth contentions.

First, Mitigation Measure 4.11-2(b) does not impermissibly piecemeal the analysis of urban decay for Gateway II. It is well settled " 'that CEQA forbids "piecemeal" review of the significant environmental impacts of a project.' (*Berkeley* [*Keep Jets over the Bay Committee v. Board of Port Commissioners* (2001)] 91 Cal.App.4th [1344,] 1358.) Rather, CEQA mandates 'that environmental considerations do not become submerged by chopping a large project into many little ones —- each with a minimal potential impact on the environment —- which cumulatively may have disastrous consequences.' (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283–284.) Thus, the Guidelines define 'project' broadly as 'the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. . . .' (Guidelines, § 15378, subd. (a).) The question of which acts constitute the 'whole of an action' for purposes of CEQA is one of law, which we review de novo based on the undisputed facts in the record. (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1224 (*Tuolumne County*).)" (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 98.)

The draft EIR in this case analyzed the urban decay to be expected for the whole of the project. The City studied the impacts of developing *all* 154 acres with a maximum of 808,000 square feet of retail space, three hotels, an auto mall, restaurants, and 100,000 square feet of office space. Thus, the City's EIR had the hallmarks of a program EIR intended to address the cumulative impacts of multiple actions –- such as for a multi-stage project. (*Vineyard, supra,* 40 Cal.4th at p. 429.) Mitigation Measure 4.11-2(b)'s tiering of further review for applications to build at specific sites within Gateway II does not run afoul of CEQA. "Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' (. . . § 21093, subd. (a); see also [Guidelines] § 15385, subd. (b).)" (*In re Bay-Delta* (2008) 43 Cal.4th 1143, 1170.) Mitigation Measure 4.11-2(b) does not constitute improper piecemealing because the City did not use tiering to downplay or segregate the cumulative impact of urban decay arising from Gateway II.

Second, CCEC objects to Mitigation Measure 4.11-2(b) on grounds the market studies are to be completed by the developer. The point is well taken. Under CEQA, a public agency cannot charge a developer with the responsibility to study the impact of a proposed project. (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 (*Sundstrom*).) *Sundstrom* involved a county delegating the duty to conduct hydrology impact studies for construction of a sewage treatment plant to the applicant. (*Id.* at p. 307.) The *Sundstrom* court held CEQA did not allow delegation of "the County's legal responsibility to assess environmental impact by directing the applicant himself to conduct the hydrological studies subject to the approval of the Planning Commission staff. Under CEQA, the EIR or negative declaration must be prepared 'directly by, or under contract to' the lead agency. (. . . § 21082.1.) The implementing regulations explicitly provide: 'The draft EIR which is sent out for public review must reflect the independent judgment of the lead agency.' ([Guidelines] § 15084, subd. (e).)"

(*Sundstrom, supra,* at p. 307.)  Here, Mitigation Measure 4.11-2(b) shifted the responsibility to Petrovich to produce the market studies in violation of CEQA.  (*Ibid.*)

Third, the Woodland City Council did not err by delegating responsibility to implement this mitigation measure to its community development department.  In *Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770, the Court of Appeal held a city council cannot delegate responsibility for considering an EIR to its planning board.  (*Id.* at p. 779.)  Under CEQA, "the EIR must be presented to the decision making body of the agency."  (*Sundstrom, supra,* 202 Cal.App.3d at p. 307.)

Here, the city council *did* act as the decision-making authority when it reviewed and approved the final EIR.  The city council made the required findings under CEQA that Gateway II would result in significant and unavoidable urban decay impacts.  In an effort to reduce those impacts, the city council adopted Mitigation Measure 4.11-2(b).  Shifting the responsibility to carry out the mitigation in that measure is allowed under CEQA.  Section 21081.6, subdivision (a)(1), provides that when changes or alterations have been required or incorporated into the project to mitigate or avoid the significant effects on the environment, the lead agency "shall adopt a reporting or monitoring program for the changes made to the project or conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment.  The reporting or monitoring program shall be designed to ensure compliance during project implementation."  Delegation of responsibility for a monitoring program is recognized by this section in its requirement that the monitoring "agency shall, if so requested by the lead agency or a responsible agency, prepare and submit a proposed reporting or monitoring program."  (*Ibid.*)  CEQA does not require that the Woodland City Council itself implement urban decay mitigation measures.

Fourth, the market study measure does not commit the City to any specific mitigation action or impose any standards for determining whether it must undertake any future measures.  The Resolution adopting the project provides only that "[i]f the market

24

study and urban decay analysis show inadequate demand, then the City shall evaluate the impacts of the use proposed for development and either require additional mitigation or require an alternate use."  Thus, the Resolution approving the project does not identify any specific mitigation measures nor does it provide any standards for the community development department to adhere to in deciding whether the developer-proposed mitigation is sufficient.  "This is inadequate.  No criteria or alternatives to be considered are set out.  Rather, this mitigation measure does no more than require a report be prepared and followed, or allow approval by a county department without setting any standards." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794.)

Here, the questions of whether mitigation measures will be required, of what they might consist, and how effective they will be are left unanswered.  Given the City's recognition that Gateway II *will* cause urban decay, it was required to do more than agree to a future study of the problem.  "An EIR is inadequate if '[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR.'  (*San Joaquin Raptor* [*Rescue Center v. County of Merced* (2007)] 149 Cal.App.4th [645,] 670.)  'A study conducted after approval of a project will inevitably have a diminished influence on decisionmaking.  Even if the study is subject to administrative approval, it is analogous to the sort of post hoc rationalization of agency actions that has been repeatedly condemned in decisions construing CEQA.' " (*Communities for a Better Environment v. City of Richmond, supra,* 184 Cal.App.4th at p. 92, quoting *Sundstrom*, *supra*, 202 Cal.App.3d at p. 307.)

The City argues the market study mitigation requirement has a specific performance standard in that each market study will have to show there is "adequate retail demand *for the proposed tenants at the site*." (Italics added.)  A showing of sufficient demand for the goods sold by a particular planned tenant *for Gateway II* does

25

not address the issue of whether urban decay *in downtown* has been sufficiently alleviated.  Moreover, the City's solution to "either require additional mitigation or require an alternate use" lacks any standard to ensure sufficient abatement of urban decay.

Lacking any "criteria for success" in abating urban decay, the measure does not ensure any actual mitigation.  (See *Communities for a Better Environment v. City of Richmond*, *supra*, 184 Cal.App.4th at p. 93.)  CEQA's requirements are not met by Mitigation Measure 4.11-2(b).

**F.**

***Urban Decay Study and Implementation Program –- Mitigation Measures 4.11-2(c)
& (d)***

CCEC contends Mitigation Measures 4.11-2(c) and (d) failed to commit the City to any feasible or enforceable mitigation measures to ameliorate the adverse effects of the project on urban decay elsewhere in Woodland.  The contention has merit.

The City adopted Mitigation Measure 4.11-2(c) to require that Petrovich "contribute funds toward the development of a Retail Strategic Plan.  The amount of the fee shall be determined in the Development Agreement between the City and the project applicant."  Mitigation Measure 4.11-2(d) requires Petrovich to "contribute funds toward preparation of an Implementation Strategy for the Downtown Specific Plan."  As with the retail strategic plan, "[t]he amount of the fee shall be determined in the Development Agreement between the City and the project applicant."

A draft of the development agreement in the administrative record provides that Petrovich "shall pay its fair share towards (a) a citywide retail strategic plan/suburban urban design and re-use analysis (a 'Retail Strategic Plan') for existing suburban retail strip centers; and (b) an implementation strategy for the Downtown Specific Plan (an 'Implementation Strategy').  The Retail Strategic Plan shall evaluate possible re-uses,

26

interventions, strategies, and process evaluations.  The Implementation Strategy shall, among other things, help define the strategies for progressing the civic and entertainment focus of downtown.  For purposes of this Paragraph . . . [Petrovich's] 'fair share' for both the Retail Strategic Plan and the Implementation Strategy shall be 50% of the actual cost of such studies, provided that [Petrovich's] collective share for both shall not exceed $45,000 in the aggregate."

The call for a retail strategic plan and implementation strategy for a downtown specific plan (fair share plans) appears in the draft EIR without further discussion or analysis.  The final EIR adopted these mitigation measures without elaboration.  Consequently, the entirety of what can be gleaned from the record about the retail strategic plan is that it is intended to "determine what retail areas shall be preserved as retail and which areas shall be developed as other uses, helping to identify repositioning strategies for those underperforming centers."  Likewise, the only information about the implementation strategy is that "among other things," it "can help define the strategies for progressing the civic and entertainment focus of downtown."

These fair share fees correspond to studies that do not obligate the City to undertake any actual mitigation of urban decay.  By their own terms, Mitigation Measures 4.11-2(c) and (d) require the City only to "prepare" the fair share plans.  These mitigation measures do not require the City to undertake any *action*.  "A commitment to pay fees without any evidence that mitigation will actually occur is inadequate."  (*Save Our Peninsula*, *supra,* 87 Cal.App.4th at p. 140.)  Mitigation Measures 4.11-2(c) and (d) stand in contrast to the "CEQA require[ment] that feasible mitigation measures actually be implemented as a condition of development, and not merely be adopted and then neglected or disregarded."  (*Anderson First, supra,* 130 Cal.App.4th at pp. 1186-1187.)

In *Anderson First*, this court considered a fair share mitigation fee program that required the proposed project to pay 16.87 percent of the estimated cost of an interstate highway interchange.  (130 Cal.App.4th at p. 1188.)  After noting fee-based mitigation

27

programs may constitute adequate measures under CEQA, *Anderson First* cautioned that "[t]o be adequate, these mitigation fees, in line with the principle discussed above, must be part of a reasonable plan *of actual mitigation* that the relevant agency commits itself to implementing." (*Ibid.,* italics added.) The mitigation measure in that case did not pass muster under CEQA because it was "vague regarding 'the program to provide [those] improvements'; in staff reports, City states it [was] preparing an update to the traffic impact fee program to include the I–5 interchange improvements, and note[d] that 'Condition 16 requires payment of the impact fee.' " (*Id.* at pp. 1188-1189.) Instead, the City of Anderson was required to "make these fees part of a reasonable, enforceable plan or program that is sufficiently tied to the actual mitigation of the traffic impacts at issue." (*Id.* at p. 1189.)

The fees in this case are more speculative than those presented in *Anderson First*, where the costs of the transportation improvements had been calculated and were in "no serious dispute." (*Anderson First, supra,* 130 Cal.App.4th at p. 1188.) Here, the administrative record does not estimate the cost to prepare the fair share plans. More importantly, the City does not estimate how much the mitigation measures or strategies called for in these plans will cost or how they might be implemented. Consequently, these are the sort of speculative mitigation measures that do not comply with CEQA. (*Id.* at pp. 1188-1189.)

The City counters the fair share plans constitute an adequate mitigation measure to address urban decay. In so arguing, the City relies on this court's decision in *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 (*SOCA*). *SOCA* involved a challenge to an EIR prepared for the expansion of a convention center and construction of an office tower. (*Id.* at p. 1016.) The EIR noted adverse impacts on traffic and parking, for which specific mitigation measures were proposed. (*Id.* at pp. 1020-1022.) In approving the project, the City "committed itself to mitigating the impacts of parking and traffic" and "approved funds for a major study of downtown transportation." (*Id.* at

28

p. 1029.)  Moreover, the EIR in *SOCA* listed specific mitigation measures and standards for parking utilization that were intended to alleviate adverse effects.  (*Ibid.*)

In contrast to the concrete, measurable actions adopted in *SOCA, supra*, 229 Cal.App.3d 1011, the record in this case contains no evidence the fair share plans exist in the City, such plans would be practicable, or the City has committed to creating such plans.  Thus, this case more closely resembles the facts presented in *Center for Sierra Nevada Conservation, supra,* 202 Cal.App.4th 1156.  In that case, the County of El Dorado began allowing developers to clear oak woodlands to a greater extent than previously allowed in exchange for payments to the Option B fee program.  (*Id.* at p. 1161.)  The Option B program, however, remained sufficiently indeterminate to allow it to qualify as an adequate mitigation measure under CEQA.  As we explained, "neither the general plan nor the program EIR included the necessary details for implementing Option B, including specifying the fee rate, the parcels for which the fee would be required prior to development, or the uses for which the fee would be employed by the County."  (*Id.* at p. 1176.)

Mitigation fee programs *may* constitute adequate mitigation to address the adverse effects of a project.  However, " 'to be considered adequate, a fee program at some point must be reviewed under CEQA, either as a tiered review eliminating the need to replicate the review for individual projects, or on a project-level, as-applied basis. . . .  Because the fees set by the ordinance have never passed a CEQA evaluation, payment of the fee does not presumptively establish full mitigation for a discretionary project.' "  (*Center for Sierra Nevada Conservation*, *supra*, 202 Cal.App.4th at pp. 1179-80, quoting *California Native Plant Society v. County of El Dorado* (2009) 170 Cal.App.4th 1026, 1030.)  Here, the City's EIRs did not adequately assess the scope of the program or fees necessary to adequately address the urban decay impacts expected to result from construction of Gateway II.

29

### G.

### *Urban Decay at the County Fair Mall –- Mitigation Measure 4.11-3(a)*

CCEC contends Mitigation Measure 4.11-3(a) purports to alleviate expected urban decay at Woodland's County Fair Mall but does not require the City to undertake any actual mitigation. The point is well taken.

In approving Gateway II, the City acknowledged the project "*would* result in physical deterioration and urban decay of retail centers in County Fair Mall, West Woodland, and East Street Corridor." (Italics added.) Mitigation Measure 4.11-3(a) addresses urban decay at the County Fair Mall by providing: "The City shall coordinate with the current owner of the County Fair Mall to prepare a strategic land use plan for the County Fair Mall to analyze potential viable land uses for the site." The City also reiterated that Mitigation Measures 4.11-2(a) through (d) would be implemented.

Mitigation Measure 4.11-3(a) requires the City to take no action other than to coordinate with the current owner to prepare a plan for viable land uses at the County Fair Mall. Mitigation Measure 4.11-3(a) does not require actual study of this aspect of urban decay. Moreover, this mitigation measure does not require any action by the City to mitigate the urban decay it may discover to result for the County Fair Mall. Under CEQA, this purported mitigation measure is inadequate. (*Anderson First, supra,* 130 Cal.App.4th at pp. 1188-1189.)

At oral argument, the City argued the programmatic nature of the EIR in this case allows for future studies and additional mitigation to fulfill CEQA mandates. As this court has previously explained, "Under Guidelines section 15168, program EIRs are used for a series of related actions that can be characterized as one large project. If a program EIR is sufficiently comprehensive, the lead agency may dispense with further environmental review for later activities within the program that are adequately covered in the program EIR. (Guidelines, § 15168, subd. (c).)" (*Center for Sierra Nevada Conservation, supra,* 202 Cal.App.4th at p. 1171.) Here, the programmatic nature of the

City's EIR does not remedy the urban decay mitigation measures' shortcomings. Although programmatic, the final EIR purported to study the project as a whole and to implement sufficient mitigation measures to ameliorate the effects of urban decay. No further mitigation measures or EIR studies for the issue of urban decay are promised by the City.

Regardless of whether the City intends to conduct further tiered EIRs for parts of the project, the program EIR is defective because it adopts inadequate mitigation measures for urban decay. "While proper tiering of environmental review allows an agency to defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval, CEQA's demand for meaningful information 'is not satisfied by simply stating information will be provided in the future.' (*Santa Clarita* [*Organization for Planning the Environment v. County of Los Angeles* (2003)] 106 Cal.App.4th [715,] 723.) As the CEQA Guidelines explain: 'Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental effects of the project and does not justify deferring such analysis to a later tier EIR or negative declaration.' ([Guidelines] § 15152, subd. (b).) Tiering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases. For example, to evaluate or formulate mitigation for 'site specific effects such as aesthetics or parking' (*id*., § 15152 [Discussion]) may be impractical when an entire large project is first approved; under some circumstances analysis of such impacts might be deferred to a later tier EIR." (*Vineyard, supra,* 40 Cal.4th at p. 431.) Having studied and attempted to mitigate the urban decay effects from the project as a whole, the City may not excuse inadequate mitigation by putting off corrective action to a future date.

**H.**

*Conclusion*

We conclude the City's mitigation measures aimed at alleviating the urban decay expected to result from Gateway II do not comply with CEQA. Except for Mitigation Measure 4.11-2(a), we conclude the adopted mitigation measures are insufficient to ensure the City will take concrete, measurable actions to counteract the urban decay expected to result in downtown and at the County Fair Mall. As to Mitigation Measure 4.11-2(a), even the City acknowledges it is only a partial solution to the urban decay impacts identified in the draft and final EIRs. Accordingly, the City has failed to adopt adequate mitigation measures to address urban decay impacts as required under CEQA.

**III**

*The Mixed-use Alternative*

CCEC contends the City failed to give meaningful consideration to project alternatives such as the mixed-use alternative. CCEC further argues no substantial evidence supports the final EIR's conclusion the mixed-use alternative was infeasible. The City counters that the issue has been largely forfeited and lacks merit in any event. We conclude the issue is cognizable and CCEC's arguments have merit.

**A.**

*Preservation of the Issue for Review*

The City asserts CCEC forfeited claims that the draft and final EIRs did not properly study traffic or air quality impacts of the mixed-use alternative. While the City acknowledges CCEC challenged the lack of consideration given to the mixed-use alternative, it asserts there were no comments made that specifically addressed traffic impacts, air quality impacts, or the economic feasibility of the mixed-use alternative. We reject the City's assertion of forfeiture. A cursory review of the draft and final EIRs shows these issues were repeatedly raised.

32

As to traffic impacts associated with the mixed-use alternative, the final EIR expressly acknowledges a comment letter that urged consideration of project alternatives on grounds that "[r]ecent studies show that appropriate design of transportation systems can reduce vehicle miles traveled (VMT) from new commercial development up to 66% by including mitigation such as transportation demand management, bike and pedestrian friendly facilities, parking supply management, density, transit proximity, and mixed use." Another commenter complained that "[t]he traffic impacts of the project are difficult to overstate." This commenter noted the increased number of trips expected; mitigation measures such as light-rail, other modes of public transportation, bicycle and pedestrian-friendly measures, and parking incentives. Citations to traffic studies were offered to help formulate effective mitigation measures. Contrary to the City's assertion, the issue of traffic impacts associated with the project and project alternatives was discussed during the comment phase of the EIR process.

So too, air quality impacts –- including concerns about greenhouse gas emissions –- were the subject of numerous comments during the EIR process. Concerns about degradation of air quality as a result of the project were raised during the EIR process. In particular, the Yolo County Board of Supervisors commented that the City was required "to identify, quantify, and mitigate for climate change and greenhouse gas (GHG) emissions," but issued a draft EIR that "does not discuss any of these issues." The board of supervisors further asserted: "The [draft EIR] concludes that the proposed 1.1 million square foot retail and auto mall is consistent with all recommended measures intended to reduce greenhouse gas emissions. However, a close examination of Tables 4.3-15 and 4.3-16 [in the draft EIR] indicates that most of the 'consistency' claims are based on mitigation measures that require future studies or plans that will be prepared and applied to the project either 'prior to issuance of grading permits' or 'at the time of submittal of the detailed development plans for Planning Commission review.' [¶] As one example, both tables cite Mitigation Measure 4.3-2, which requires the applicant to submit a GHG

33

reduction strategy that 'shall describe in text and on the site plan' how nine very broad standards will be implemented. The standards include such guidance as 'reuse and recycle construction and demolition waste' and 'create water-efficient landscapes.' However, no details on how compliance will be achieved and/or no specific approval procedures for future phasing are required to ensure that the measures will achieve GHG reduction." Nonetheless, the final EIR concluded that "[t]he City has imposed all feasible mitigation to reduce air quality impacts of the project." Regardless of the correctness of the final EIR's conclusion, it is clear the issue of air quality impacts was raised as part of the EIR process.

As to the economic viability of the mixed-use alternative, CCEC argued during the EIR process: "The City should reject as inadequate the basis provided in the EIR for rejecting the Mixed-Use Alternative and the Reduced Intensity Alternative. It is clear that both of these as well as alternative commercial sites along the rail corridor provide feasible alternatives that would reduce impacts while meeting project objectives. [¶] The attempted justification for the adverse environmental impacts is not adequate. The EIR states that the project is intended to prevent 'leakage of sales,' but this term is never defined or explained. In particular there is no explanation of why it is necessary to build a commercial center that serves four counties in order to prevent 'leakage of sales' from the City of Woodland." CCEC's critique of the "leakage of sales" rationale used by the City to dismiss the mixed-use alternative was included in its briefing in the trial court. Accordingly, the issue of whether economic infeasibility served as a basis for rejecting the mixed-use alternative has been preserved for our review.

**B.**

***CEQA Requires the Lead Agency to Consider Feasible Alternatives***

The California Supreme Court has explained, "CEQA's substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures is effectuated in section 21081. (See *City of Poway* [*v. City of*

34

*San Diego* (1984) 155 Cal.App.3d [1037,] 1045–1046.)  Under this provision, a decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and mitigation measures.  (§ 21081; see also *Environmental Council v. Board of Supervisors* (1982) 135 Cal.App.3d 428, 439.)  The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision.  (*Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 440–441; *City of Poway, supra*, 155 Cal.App.3d at p. 1046; *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 896.)  Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures.  (*City of Poway, supra*, 155 Cal.App.3d at p. 1046.)"  (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134.)

## C.

### *The City's Rejection of the Mixed-use Alternative*

The City's draft EIR stated it limited its discussion to feasible alternatives. Infeasible alternatives were described in the draft EIR as "[t]hose alternatives that would have impacts identical to or more severe than the proposed project, and/or that would not meet any or most of the project objectives."  The draft EIR analyzed two alternative designs for Gateway II:  a reduced-intensity alternative and a mixed-use alternative.

The reduced-intensity alternative would be limited to 295,000 square feet of retail (including restaurants) and two auto dealerships –- all encompassing no more than 93 acres.

The mixed-use alternative would also be limited to a total of 93 acres.  It would consist of 200,000 square feet of commercial development (including restaurants), two

35

auto dealerships, and a "five acre site for a 100-unit multi-family development at approximately 20 units per acre." This alternative would also include "a local-serving commercial town center (with approximately 50 residential units located above the center) to enhance a sense of community among residents."

The draft EIR rejected the reduced-intensity alternative and mixed-use alternative on the grounds of economic infeasibility. It concluded, "these alternatives would not meet the following project objectives related to economic feasibility: [¶] 1) Facilitate the development of a regional retail center to better capture leakage of sales from uses not already served within the community; and [¶] [(2)] Develop revenue generating land uses to provide jobs and capture regional retail leakage."

As to the environmental impacts of the mixed-use alternative, the draft EIR assumed similarity with Gateway II as proposed. The draft EIR explains: "The Mixed Use Alternative would decrease the development of roadways, driveway, and parking areas, as compared to the proposed project. . . . Transportation and circulation impacts are directly related to land development activities. The Mixed Use Alternative would reduce the commercial trips generated by the proposed project; however, would result in increased trips associated with the proposed residential uses. Therefore, *it is assumed* that the transportation and circulation impacts of the Mixed Use Alternative would be similar to the proposed project." (Italics added.)

The draft EIR contains no evidence the mixed-use alternative would have similar or greater environmental impacts than the project as proposed by Petrovich. In the final EIR, the City asserted that "[t]he draft EIR included analysis of a Mixed-Use Alternative which would result in fewer impacts related to physical deterioration and urban decay."

In approving Gateway II, the City did not reject the mixed-use alternative on grounds of economic infeasibility as set forth in the draft EIR. Instead, the City declared: "For the reasons set forth below in the Supporting Explanation, the City Council rejects the Mixed Use Alternative because (1) it is infeasible and ([2]) because the Mixed-Use

36

Alternative would have greater environmental impacts than the proposed project. (State CEQA Guidelines § 15126.6(c).) . . . [¶] Supporting Explanation: The Mixed-Use Alternative would result in greater public services and utilities impacts, as compared to the proposed project. Impacts to land use and agricultural resources, biological resources, and hydrology and water quality would be fewer, as compared to the proposed project. All other impacts would be equal to those of the proposed project. Because the Mixed-Use Alternative would, overall, result in greater impacts than the proposed project, the Alternative is considered infeasible. (Draft EIR, pp. 6-11 to 6-15.)" The City's conclusion about environmental impacts was also in the final EIR, which noted this alternative would have "fewer impacts related to physical deterioration and urban decay."

Gateway II, as approved, significantly scaled back the scope of the project to 61.3 acres of "General Commercial" development. However, the City did not explain how the mixed-use alternative could be deemed economically infeasible with only 93 acres of development (comprising 200,000 square feet of future commercial development in addition to five acres of residential housing units) when the approved project consists of only 61.3 acres (comprising "up to 340,000 square feet of future commercial development").

## D.

### *Feasibility of the Mixed-use Alternative*

Although the draft and final EIRs rejected the mixed-use alternative on grounds of *economic* infeasibility, the City approved the project on grounds the mixed-use alternative was *environmentally* inferior. The City did not acknowledge it switched from the rationale of "economic infeasibility" due to "leakage of sales" to one of "greater environmental impacts" as the ground for rejecting the mixed-use alternative. The administrative record does not indicate the City discovered additional information showing the mixed-use alternative to be an inferior environmental alternative.

37

The City attempts to explain its shift by asserting that "[t]he determination in the EIR that the Mixed-Use Alternative failed to meet project objectives *was the opinion of the City's EIR consultants*." (Italics changed.) The City continues that "[a]s such, the feasibility conclusions in the EIR were not binding on the City Council, and the Council had discretion to reach conclusions that differed from those in the EIR." We disagree.

The City adopted a rationale unsupported by its EIR analysis. The City's unexplained switch from a rationale of economic infeasibility to environmental inferiority as the basis for rejecting the mixed-use alternative conflicts with CEQA's requirement to "disclose 'the "analytic route the . . . agency traveled from evidence to action" ' . . . ." (*Vineyard, supra,* 40 Cal.4th at p. 445, quoting *Laurel Heights Improvement Ass'n v. Regents of University of California* (1988) 47 Cal.3d 376, 404 (*Laurel Heights I*).) Here, the City's administrative process sheds no light on how it came to reject the mixed-use alternative based on environmental inferiority instead of economic infeasibility in the draft and final EIRs. Consequently, the City has failed to comply with CEQA in rejecting the mixed-use alternative on grounds of environmental inferiority to the project as approved.

## IV

### *Whether the Final EIR Failed to Properly Identify and Analyze Potentially Significant Energy Impacts Resulting from Gateway II*

CCEC argues the City's EIRs did not properly analyze or mitigate the potentially significant energy impacts generated by Gateway II. We agree.

### A.

### *Issue Preservation*

The City asserts CCEC forfeited its contentions regarding energy impacts because CCEC did not cite Appendix F during the EIR process. Appendix F of the CEQA Guidelines requires that projects assess the energy impacts of a project when a fair

argument can be made that the project will have significant environmental impact. (See part IV C., *post* [examining Appendix F].) We disagree.

CCEC was not required to cite specific sections of the CEQA Guidelines to preserve the issue of energy impacts for review. "This is because ' "[i]n administrative proceedings, [parties] generally are not represented by counsel. To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them." (Note (1964) Hastings L.J. 369, 371.) It is no hardship, however, to require a layman to make known what *facts* are contested.' (*Kirby v. Alcoholic Bev. etc. Appeals Bd.* (1970) 8 Cal.App.3d 1009, 1020.)" (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 163, italics added.)

CCEC presented its concerns about the potential energy impacts of Gateway II to the City during the EIR process. Under the rubric "Energy Impacts," CCEC commented: "The EIR should contain a cumulative evaluation of the energy impacts that would be involved in the construction and operation of the center. For example, project implementation would involve building pads, roads, and appurtenant improvements. This construction requires energy including diesel fuel. Additional energy is required for the construction of structures. [¶] The energy impacts of future project operation should be evaluated. The operation of commercial buildings requires electricity and natural gas for space heating, cooling, ventilation, lighting, water heating, equipment operation, maintenance, etc. The cumulative impacts on energy supplies and energy-efficient design alternatives should be evaluated."

Also during the EIR process, CCEC addressed its concerns about transportation energy impacts. CCEC commented: "Direct and indirect energy impacts should be evaluated including energy that would be consumed in the construction and operation of the required transportation infrastructure and in the manufacture, operation, and maintenance of on-road vehicles."

Consequently, the City's assertion that the issue of transportation energy was not addressed during the administrative process lacks merit. CCEC included its energy impact concerns in its briefing on the issue in the trial court. Thus, CCEC has preserved the issue of energy impacts for review.

**B.**

***The City's Energy Impacts Analysis***

The entirety of the City's energy impacts analysis for Gateway II comprises less than a page in the draft EIR.[6] In pertinent part, the draft EIR states: "Based upon reports

---

[6] Upon reviewing the record, it appears the EIRs and the Resolution required a number of measures that would likely have the collateral effect of substantial energy-saving effects. However, these directives are adopted under the rubric of reducing "overall project-generated *emissions of ozone-precursor pollutants* by approximately 15 percent." (Italics added.) Given that these measures address ozone-precursor pollutants rather than energy impacts, it is understandable that the City does not rely on Mitigation Measure 4.3-2 in defending the adequacy of the proposed energy saving mitigation measures.

Mitigation Measure 4.3-2 appears to require Petrovich to "[d]esign buildings to be energy efficient. Site buildings to take advantage of shade, prevailing winds, landscaping and sun screens to reduce energy use. [¶] Install efficient lighting and lighting control systems. Daylight should be used as an integral part of lighting systems in buildings, sufficient to provide lighting for 75 percent of interior work spaces of proposed buildings. [¶] Install light colored 'cool' roofs and pavements (i.e., high reflectance, high emittance roof surfaces, or exceptionally high reflectance and low emittance surfaces) and strategically placed shade trees. [¶] Install energy efficient heating and cooling systems, appliances and equipment, and control systems. [¶] Install light emitting diodes (LEDs) for traffic, street, and other outdoor lighting. [¶] Limit the hours of operation of outdoor lighting. [¶] Provide the necessary facilities and infrastructure to encourage the use of low or zero-emission vehicles (e.g., electric vehicle charging facilities and conveniently located alternative fueling stations) and public transit into project design. [¶] Include internal pedestrian and bicycle routes that connect to adjacent pedestrian and bicycle routes; as well as, transit stops located either onsite or along adjacent roadways. Create travel routes that ensure that destinations may be reached conveniently by public transportation, bicycling or walking. [¶] Promote ridesharing programs (e.g., by designating a certain percentage of parking spaces for ride sharing, designating adequate· passenger loading and unloading and waiting areas for ride sharing vehicles). [¶] Plant

40

and data provided by the California Energy Commission and the Energy Information Administration of the USDOE, the average annual usage of electricity is roughly 13 kWh/square foot and the average annual usage of natural gas is roughly 37 cubic feet/square foot for commercial buildings. Based upon these figures the proposed project would be expected to produce a demand for 10,504,000 kWh of electricity annually and 29,896,000 cubic feet of natural gas annually.

"The [Building Code] energy conservation requirements for non-residential buildings would be applied. . . . [¶] Pursuant to the [Building Code] and the Energy Efficiency Standards, the City of Woodland would review the design components of the energy efficiency and conservation measures as specific plans are submitted. In addition, a substation, multiple utility lines (60 kV, 115 kV, and 230 kV), and gas transmission lines exist in the area to serve the buildout of the proposed project.

"The proposed project would be subject to the above-identified reviews to ensure that the project complies with (or exceeds) Title 24 guidelines and regulations. Therefore, although the project would result in an increased demand for energy, the proposed project would be expected to have a *less-than-significant* impact regarding the wasteful, inefficient, or unnecessary consumption of energy.

---

and maintain trees to help shade hardscape parking and pedestrian surfaces. [¶] Incorporate onsite transit facility improvements (e.g., pedestrian shelters, route information, benches, lighting) to coincide with existing or planned transit service. [¶] Provide on-site bicycle storage and showers for employees that bike to work. [¶] Air conditioning with Non-HCFC refrigerants should be installed in new buildings. [¶] Building equipment should be Energy-Star rated to the extent applicable. [¶] Design on-site structures to exceed California Title 24 energy conservation requirements."

Although there is likely to be a high correlation between reducing greenhouse emissions and energy savings, this court cannot assume the overlap is sufficient under CEQA's study and mitigation requirements. As CCEC correctly observes, "Air quality mitigation is not a substitute for an energy analysis." Thus, we will not consider Mitigation Measure 4.3-2 in our discussion of mitigation measures addressing energy impacts.

41

"Mitigation Measure(s)  [¶]  *None required.*"

The City's final EIR adopted the draft EIR's analysis without substantive change.

## C.

### *Appendix F to the CEQA Guidelines*

Under CEQA, an EIR is "fatally defective" when it fails "to include a detailed statement setting forth the mitigation measures proposed to reduce wasteful, inefficient, and unnecessary consumption of energy."  (*People v. County of Kern* (1976) 62 Cal.App.3d 761, 774.)  The requirement to adopt energy impact mitigation measures "is substantive and not procedural in nature and was enacted for the purpose of requiring the lead agencies to focus upon the energy problem in the preparation of the final EIR."  (*Id.* at p. 774.)  However, "lead agencies have not consistently included such analysis in their EIRs."  (Cal. Natural Resources Agency, Final Statement of Reason for Regulatory Action:  Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB97 (Dec. 2009), p. 71.)  For this reason, the California Natural Resources Agency amended Appendix F to the CEQA Guidelines in 2009 "to ensure that lead agencies comply with the substantive directive in section 21100(b)(3)."[7]  (*People v. County of Kern, supra,* at p. 774.)

Appendix F of the Guidelines declares that "[t]he goal of conserving energy implies the wise and efficient use of energy."  (Guidelines, app. F, § (I).)  To this end, Appendix F notes that "[t]he means of achieving this goal include:  [¶]  (1) decreasing overall per capita energy consumption,  [¶]  (2) decreasing reliance on fossil fuels such as coal, natural gas and oil, and  [¶]  (3) increasing reliance on renewable energy sources."

---

[7]  Section 21100, subdivision (b), provides than an EIR "shall include a detailed statement setting forth all of the following:  [¶] . . . [¶]  (3) Mitigation measures proposed to minimize significant effects on the environment, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary consumption of energy."

42

(*Ibid.*)  Thus, Appendix F provides that "[p]otentially significant energy implications of a project shall be considered in an EIR to the extent relevant and applicable to the project." (*Id.* at § II.)  Among the factors to be considered, if applicable to the project, are "[p]otential measures to reduce wasteful, inefficient and unnecessary consumption of energy during construction, operation, maintenance and/or removal" including "[a]lternate fuels (particularly renewable ones) or energy systems."  (*Id.* at § (D)(4).)

**D.**

***The City's Energy Impacts Analysis***

***1. Transportation Energy Impacts***

Appendix F states that environmental impacts subject to the EIR process include "[t]he project's projected transportation energy use requirements and its overall use of efficient transportation alternatives." (Guidelines, app. F, subd. (II)(C)(6).)  Here, the City's draft EIR anticipated Gateway II would generate up to 40,051 new vehicle trips each day.  Of these, 40 percent of the trips were expected to originate outside the city. Nonetheless, the City concluded the energy impacts from the project would be less than significant.  In so concluding, the City's energy impacts analysis did not address the transportation energy impacts of the project.

On appeal, the City does not deny its EIRs did not assess transportation energy impacts.  Instead, the City argues its reduction of the size of the project as approved necessarily means some of the transportation energy impact was mitigated.  The City also asserts it has mitigation measures designed to reduce vehicle trips.  Of course, the City cannot say how much less transportation energy is needed for the project as approved because the issue has never been assessed in an EIR.  CEQA EIR requirements are not satisfied by saying an environmental impact is something less than some previously unknown amount.  (*Vineyard, supra,* 40 Cal.4th at p. 445; *Laurel Heights I, supra*, 47 Cal.3d at p. 404)

43

We conclude the City's EIR analysis is deficient insofar as it does not assess or consider mitigation for transportation energy impacts of the project.

## 2. *Construction and Operational Energy Impacts*

Appendix F states that when relevant to a project, an EIR should consider: "Energy consuming equipment and processes which will be used during *construction, operation* and/or removal of the project. If appropriate, this discussion should consider the energy intensiveness of materials and equipment required for the project." (Guidelines, app. F, subd. (II)(A)(1), italics added.) Further, Appendix F notes an EIR should consider whether the project involves "Unavoidable Adverse Effect" such as "wasteful, inefficient and unnecessary consumption of energy during the project construction, operation, maintenance and/or removal that cannot be feasibly mitigated." (*Id.* at subd. (II)(F).)

In approving Gateway II, the City found that requiring Petrovich to comply with the Building Code sufficed to address energy impact concerns for the project. "California building standards are contained in title 24 of the California Code of Regulations. (*International Assn. of Plumbing etc. Officials v. California Building Stds. Com*. (1997) 55 Cal.App.4th 245, 248.) Included in those standards are the California Building Energy Efficiency Standards. (Cal. Code Regs., tit. 24, part 6.)" (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 932 (*Tracy First*).) Although the Building Code applies to all nonresidential buildings, it does not extend beyond the buildings themselves. It addresses the building's envelope, exterior lighting, and signage. (Building Code, § 100, subd. (b) & Table 100-A, ["Application of Standards"].) Thus, the Building Code sets forth minimum efficiency requirements for air-conditioning, heating, windows, roofs, and insulation. (Building Code, §§ 112, 116, 118, 123.)

Although the Building Code addresses energy savings for components of a new commercial construction, it does not address many of the considerations required under Appendix F of the CEQA Guidelines. These considerations include whether a building

44

should be constructed at all, how large it should be, where it should be located, whether it should incorporate renewable energy resources, or anything else external to the building's envelope. Here, a requirement that Gateway II comply with the Building Code does not, by itself, constitute an adequate assessment of mitigation measures that can be taken to address the energy impacts during construction and operation of the project.

The City asserts that, in addition to the Building Code, the "[p]roject must also comply with [CALGreen], which contains further requirements for energy conservation in new construction." CALGreen took effect on January 1, 2011. (Cal. Building Standards Com. (2010) Cal. Green Building Standards Code: CALGreen, p. i.) As it applies to nonresidential new construction, CALGreen is intended to provide guidance on "planning, design and development methods that include environmentally responsible site selection, building design, building siting and development to protect, restore and enhance the environmental quality of the site and respect the integrity of adjacent properties." (CALGreen, § 5.101.) As the draft EIR noted, CALGreen sets forth such requirements as a 20 percent reduction in indoor water use, separate water meters for nonresidential buildings, diversion of construction waste from landfills, energy systems inspections for buildings larger than 10,000 square feet, and low-pollutant interior finish materials.

Like the Building Code, CALGreen does not address construction and operational energy impacts for a project intended to transform agricultural land into a regional commercial shopping center. (See CALGreen, §§ 5.201.1-5.508.) Moreover, CALGreen does not address transportation energy impacts for a project such as Gateway II. (See *ibid.*)

We also reject the City's reliance on *Tracy First, supra,* 177 Cal.App.4th 912. That case involved a challenge under CEQA to the City of Tracy's approval to build a 95,900-square-foot supermarket. (*Tracy First* at p. 916.) The City of Tracy's EIR included 17 pages discussing energy issues and 8 pages discussing energy impacts. The

45

EIR concluded no mitigation measures were required because there was no significant energy impact. (*Id.* at pp. 930-931.) On appeal, Tracy First made "an argument with respect to the EIR's reliance on the California Building Energy Efficiency Standards that [was] difficult to comprehend." (*Id.* at p. 933.) The *Tracy First* court concluded, as to the "argument that it is improper to rely on state building standards in determining whether an energy impact is significant, we disagree. CEQA requires '[m]itigation measures proposed to minimize significant effects on the environment, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary consumption of energy.' (. . . § 21100, subd. (b)(3).) The California Building Energy Efficiency Standards are meant to promote energy efficiency, as the name implies. In other words, they 'reduce the wasteful, inefficient, and unnecessary consumption of energy.' [Citation.] Other than arguing that reliance on the building standards is not enough, *Tracy First makes no argument concerning what more the EIR should have done*." (*Tracy First*, *supra*, 177 Cal.App.4th at pp. 933-934, italics added.) Ultimately, with respect to energy impacts, the *Tracy First* court held Tracy First had failed to show that the City of Tracy prejudicially abused its discretion based on lack of substantial evidence. (*Id*. at p. 936.)

Here, unlike *Tracy First*, the City did not properly assess the construction and operational energy impacts of Gateway II. Tellingly, the City concedes the draft EIR "did not consider the potential energy impacts associated with the additional square footage of [uses other than the 808,000 square feet of retail space] assumed at buildout." Thus, the City acknowledges it did not study the construction or operational energy impacts of three hotels, a 20,000 square foot restaurant, three fast food restaurants, an auto mall, and 100,000 square feet of office space. Although the City characterized the omission as nonprejudicial, the failure to study the energy impacts resulting from a large part of the planned construction is not inconsequential. " ' The error is prejudicial "if the failure to include relevant information precludes informed decisionmaking and informed

46

public participation, thereby thwarting the statutory goals of the EIR process." ' (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra*, 27 Cal.App.4th at pp. 721–722.)" (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 118.)  Thus, we reject City's assertion it would have approved the project regardless of what a proper energy impacts analysis would have been.  We conclude the City's EIRs were inadequate because they lacked a discussion or analysis of the energy impacts of the project.

### 3.  Renewable Energy Impacts

The introduction to Appendix F states that its goals include "increasing reliance on renewable energy sources."  (Guidelines, app. F, subd. (I)(3).)  Appendix F further states that "Mitigation Measures may include:  [¶] . . . [¶]  4.  Alternate fuels (particularly renewable ones) or energy systems."  (*Id.* at subd. (II)(D)(4).)  Nonetheless, the City's EIRs for Gateway II do not indicate any investigation into renewable energy options that might be available or appropriate for the project.

The City responds that it "was not required to incorporate any renewable energy features suggested by [CCEC] in order to reduce renewable energy features."  This assertion misses the point of CCEC's claim under CEQA:  the City's EIRs omit any discussion or analysis of renewable energy options for Gateway II.  CEQA is violated when an EIR contains no discussion of a potentially significant environmental consideration.  (*California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1236)

Here, the City's EIRs failed to comply with the requirements of Appendix F to the Guidelines by not discussing or analyzing renewable energy options.

APPEAL BY THE CITY OF WOODLAND

### V

### Taxing Costs

On cross-appeal, the City argues it should have been awarded costs associated with helping to prepare the administrative record.  The trial court denied the City's

request for record preparation costs finding the circumstances did not warrant "an award of costs to [the City] in order 'to preserve the statutory purposes of cost containment and expediting CEQA litigation.' " Under CEQA, "the *prevailing party* in a CEQA action may recover 'reasonable costs or fees imposed for the preparation' of the record, even if the non-prevailing party elected to prepare the record pursuant to section 21167.6, subdivision (b)(2)." (*St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th 989, 1019, italics added.) Our conclusion that the City erred in several respects under CEQA necessitates remand and renders any determination of costs to the prevailing party premature.

DISPOSITION

The judgment is reversed, and the matter remanded to the trial court to grant California Clean Energy Committee's petition for writ of mandate on grounds (1) the City of Woodland's urban decay mitigation measures are insufficient under the California Environmental Quality Act, (2) the final environmental impact report violates the California Environmental Quality Act by not properly assessing the feasibility of the mixed-use alternative, and the City of Woodland's rationale for rejecting the mixed-use alternative is not supported by substantial evidence in its environmental impact reports, and (3) the City of Woodland did not properly assess transportation, construction, and operational energy impacts in its environmental impact reports.

The trial court shall vacate the award of costs to the City of Woodland as the prevailing party and shall retain jurisdiction over this action by way of a return to the writ of mandate demonstrating the City of Woodland has rescinded its final environmental impact report certification and project approval, after which the City of Woodland shall exercise its independent judgment as to how to proceed. (Pub. Resources Code, § 21168.9, subd. (b).)

48

California Clean Energy Committee shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3) & (5).)



                                          HOCH          , J.



We concur:



          ROBIE          , Acting P. J.



          DUARTE      , J.

CERTIFIED FOR PARTIAL PUBLICATION*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----


| | |
|---|---|
| CALIFORNIA CLEAN ENERGY COMMITTEE, | |
| Plaintiff and Appellant, | C072033 |
| v. | (Super. Ct. No. CVPT112146) |
| CITY OF WOODLAND, | ORDER FOR PARTIAL PUBLICATION |
| Defendant and Appellant; | [NO CHANGE IN JUDGMENT] |
| PETROVICH DEVELOPMENT COMPANY, LLC, et al., | |
| Real Parties in Interest and Respondents. | |


APPEAL from a judgment of the Superior Court of Yolo County, Daniel P. Maguire, J.  Reversed.

Law Office of Eugene Wilson and Eugene S. Wilson for Plaintiff and Appellant.

Remy Moose Manley, Whitman F. Manley, Sabrina V. Teller, Amanda R. Berlin and Holly W. Roberson for Defendant and Appellant.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and V.

1

Herum Crabtree Suntag and Steven A. Herum for Real Parties in Interest and Respondents.

The opinion in the above entitled matter filed on February 28, 2014, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be certified for partial publication in the Official Reports and accordingly, it is ordered.

FOR THE COURT:


_____ROBIE_____, Acting P.J.


_____HOCH_____, J.


2