[No. A145581. First Dist., Div. Three. June 21, 2016.]

UKIAH CITIZENS FOR SAFETY FIRST, Plaintiff and Appellant, v.
CITY OF UKIAH et al., Defendants and Respondents.

**COUNSEL**

Kopper & Morgan, and William D. Kopper for Plaintiff and Appellant.

Rapport and Marston, David J. Rapport; Armbruster Goldsmit & Delvac, Damon P. Mamalakis and Dale J. Goldsmith for Defendant and Respondent.

**OPINION**

**POLLAK, J.**—Plaintiff Ukiah Citizens for Safety First (Citizens) appeals from the denial of its petition for writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] challenging the certification of an environmental impact report (EIR) by the City of Ukiah and its city council (the city) for the construction of a Costco Wholesale Corporation (Costco) retail store and gas station. Citizens contends (1) the EIR did not properly identify and analyze potentially significant energy impacts generated by the project; (2) the EIR's analysis of transportation and traffic impacts is inadequate; (3) the EIR's analysis of noise impacts is inadequate; and (4) the project is inconsistent with applicable zoning requirements.

We agree with Citizens that the EIR fails to sufficiently analyze potential energy impacts and that the adoption of an addendum to the EIR subsequent to approval of the EIR and of the project failed to comply with CEQA requirements. In the unpublished portion of this opinion, we reject the remainder of Citizens' contentions. Accordingly, we shall reverse the judgment and instruct that the petition for writ of mandate be granted with respect to the analysis of energy impacts of the project and affirm the trial court's decision in all other respects.

---

[1] All further statutory references are to the Public Resources Code unless otherwise noted.

## Factual and Procedural Background

On February 1, 2011, Costco applied for a use permit to construct a warehouse store and gas station (the project) on a 15.33-acre site located in the southeast section of the city. Because the project did not comport with current zoning, Costco also sought to have the site rezoned.

On January 30, 2013, the city released a draft EIR for the project. In November 2013, following the period for public comment, the city released the final EIR. The EIR describes the project as a 148,000-square-foot retail facility with a bakery, pharmacy, optical center, hearing aid testing center, food court, photo center, tire center, and a gas station with 16 pumps. The store would provide 608 parking stalls for customer vehicles.

Among other things, the EIR reports the project would increase traffic volumes on area roadways resulting in significant traffic impacts at identified intersections. The EIR includes mitigation measures to reduce the impact, including modifications to the impacted intersections, that will result in acceptable conditions at the impacted intersections. However, due to uncertainty of timing and funding of the mitigation measures, the EIR concludes that the traffic impacts of the project cannot be mitigated to a level that is less than significant. The EIR also concludes that the increase in local traffic volumes would result in higher noise levels along local roadways but that traffic noise associated with the project would be less than significant.

On December 18, 2013, the city certified the EIR and adopted a statement of overriding considerations. On January 15, 2014, the city adopted the necessary rezoning legislation. The CEQA notice of determination was filed on January 16, 2014.

On February 11, 2014, Citizens filed a petition for a writ of mandate challenging the sufficiency of the EIR and the related rezoning legislation. On May 1, 2015, the court issued a decision denying the petition in its entirety. Citizens filed a timely notice of appeal.

## Discussion

### 1. *Standard of Review*

The city's compliance with CEQA is reviewed for an abuse of discretion. (§ 21168.5.) An "[a]buse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*) " 'An appellate court's review of the administrative record for legal error and substantial evidence in a

CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [public agency] and whether it contains substantial evidence to support the [public agency's] factual determinations.' [Citation.] . . . When a public agency does not comply with procedures required by law, its decision must be set aside as presumptively prejudicial. [Citation.] [¶] Noncompliance by a public agency with CEQA's substantive requirements or noncompliance with its information disclosure provisions that preclude relevant information from being presented to the public agency 'constitute[s] a prejudicial abuse of discretion within the meaning of [s]ections 21168 and 21168.5 . . . , regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citations.] 'In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation.' [Citation.] We apply the substantial evidence standard of review to a public agency's 'conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions.' [Citation.] 'Substantial evidence' is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] 'The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.' [Citation.] However, '[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous . . . is not substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 839–840 [195 Cal.Rptr.3d 614].)

## 2. *Energy Impacts*

■ "An EIR must include a statement concerning '[m]itigation measures proposed to minimize significant effects on the environment, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary

consumption of energy.' (. . . § 21100, subd. (b)(3).) The CEQA guidelines[2] provide that: 'Energy conservation measures, as well as other appropriate mitigation measures, shall be discussed when relevant. Examples of energy conservation measures are provided in [a]ppendix F.' (CEQA Guidelines, § 15126.4, subd. (a)(1)(C).) Appendix F of the CEQA guidelines . . . states: 'Potentially significant energy implications of a project should be considered in an EIR [to the extent relevant and applicable to the project]. The following list of energy impact possibilities and potential conservation measures is designed to assist in the preparation of an EIR. In many instances specific items may not apply or additional items may be needed.' In list form, [a]ppendix F discusses how energy consumption and conservation may be analyzed in the EIR." (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 930 [99 Cal.Rptr.3d 621].)[3]

The EIR, as certified on December 18, 2013, does not contain a separate section for the analysis of energy impacts. Rather, energy impacts are mentioned throughout the EIR. The city points out that the potential increase in electrical and natural gas usage and whether the project would result in wasteful, inefficient, or unnecessary energy consumption are discussed in conjunction with the analysis of impacts to public utilities in section 3.9 of the EIR. The city also cites to the discussion of the effects of energy usage on air quality and greenhouse gas emissions found in the discussion of global climate change in section 3.11 of the EIR.

---

[2] As in the opinion which is here quoted, we shall refer in this opinion to the regulations appearing at California Code of Regulations, title 14, section 15000 et seq., as the "CEQA Guidelines."

[3] Appendix F of the CEQA Guidelines lists the environmental impacts that may be included in the EIR: "1. The project's energy requirements and its energy use efficiencies by amount and fuel type for each stage of the project including construction, operation, maintenance and/or removal. If appropriate, the energy intensiveness of materials maybe discussed. [¶] 2. The effects of the project on local and regional energy supplies and on requirements for additional capacity. [¶] 3. The effects of the project on peak and base period demands for electricity and other forms of energy. [¶] 4. The degree to which the project complies with existing energy standards. [¶] 5. The effects of the project on energy resources. [¶] 6. The project's projected transportation energy use requirements and its overall use of efficient transportation alternatives." (CEQA Guidelines, appen. F, § II, subd. C.1.–6.) Appendix F also lists mitigation measures that may be included in the EIR: "1. Potential measures to reduce wasteful, inefficient and unnecessary consumption of energy during construction, operation, maintenance and/or removal. The discussion should explain why certain measures were incorporated in the project and why other measures were dismissed. [¶] 2. The potential of siting, orientation, and design to minimize energy consumption, including transportation energy, increase water conservation and reduce solid-waste. [¶] 3. The potential for reducing peak energy demand. [¶] 4. Alternate fuels (particularly renewable ones) or energy systems. [¶] 5. Energy conservation which could result from recycling efforts." (*Id.*, subd. D.1.–5.)

In section 3.9.8, the EIR concludes that the project "would not exceed existing gas and electric supply or result in wasteful, inefficient, or unnecessary consumption of energy." The EIR explains, "The proposed [p]roject would intensify development on the [p]roject site, thereby increasing demand for gas and electric service. On-site employment and uses, such as the warehouse store and tire center, would use gas and electricity. These uses would generate demand for 2.44 million kilowatt hours of electricity per year . . . . The [p]roject area has existing distribution facilities and capacity to serve the [p]roject. [¶] The energy consumption demands of the proposed [p]roject would conform to the [California Code of Regulations'] Title 24 energy conservation standards such that the development would not be expected to wastefully use gas and electricity. The proposed [p]roject would also be designed to include several sustainable features. Among these features are regional sourcing of building materials, higher solar reflectivity metal wall panels, reflective roof materials, and tripled-glazed skylights . . . .[4] Since the proposed [p]roject would comply with [t]itle 24 conservation standards, implement additional sustainable features, and be served by the City of Ukiah, the proposed [p]roject would not directly require the construction of new energy generation or supply facilities, or result in wasteful, inefficient, or unnecessary consumption of energy. Consequently, the impact would be less than significant." (Boldface omitted.)

In section 3.11.1, relating to "Global Climate Change," the EIR acknowledges that the project "could generate [greenhouse gas] emissions that may have a significant impact on the environment" but explains that implementation of mitigation measures that "include incorporation of sustainability features in the building and site design in order to reduce energy consumption and exceed the Title 24 building efficiency ratings, (Measure 3.2.2a), implementation of a carpool/vanpool program (Measure 3.2.2b), increase transit accessibility (Measure 3.2.2c), and improve the pedestrian network (Measure 3.2.2d) . . . [¶] . . . would reduce [the] emissions . . . . However, the majority of the [greenhouse gas] emissions are mobile-source, and feasible reduction measures beyond vehicle fuel efficiency (state and federal requirements), and encouraging alternative transportation, are not available."

Citizens' petition asserts that the EIR "fails to include adequate information regarding the project's energy use and does not comply with appendix F of the CEQA Guidelines." Specifically, Citizens argues that the EIR failed to calculate the energy use attributable to vehicle trips generated by the project and failed to calculate the operational and construction energy use of the project. After the EIR was certified and Citizens filed its writ petition, on February 28, 2014, the Court of Appeal for the Third District issued its

---

[4] The EIR lists on pages 2-8 and 2-9 the typical sustainable building features incorporated into new Costco warehouses to conserve energy and natural resources.

opinion in *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173 [170 Cal.Rptr.3d 488] (*Clean Energy*).

■ In *Clean Energy*, the court held that the analysis of energy impacts in an EIR, which was in all material respects the same as that undertaken by the city in this case, was not adequate. (*Clean Energy, supra*, 225 Cal.App.4th at pp. 206–207.) With respect to the EIR's analysis of transportation energy impacts, the *Clean Energy* court noted that the EIR concluded the project would result in 40,051 new vehicle trips each day but failed to assess any transportation energy impacts of these vehicle trips. (*Id.* at p. 210.) The court rejected the City of Woodland's argument that the EIR's mitigation measures designed to reduce vehicle trips would also reduce energy impacts, explaining the City of Woodland "cannot say how much less transportation energy is needed for the project as approved because the issue has never been assessed in an EIR. CEQA EIR requirements are not satisfied by saying an environmental impact is something less than some previously unknown amount." (*Clean Energy*, at p. 210.) With respect to the analysis of operational and construction energy use of the project, the court found that the City of Woodland's reliance on mitigation measures that required compliance with title 24 of the California Code of Regulations and other California green building codes did not meet the requirements of appendix F of the CEQA Guidelines. (*Clean Energy*, at p. 210.) The court explained, "Although the [California Building Standards Code (Cal. Code Regs., tit. 24, pt. 6)] addresses energy savings for components of new commercial construction, it does not address many of the considerations required under appendix F of the CEQA Guidelines. These considerations include whether a building should be constructed at all, how large it should be, where it should be located, whether it should incorporate renewable energy resources, or anything else external to the building's envelope. Here, a requirement that [the project] comply with the Building Code does not, by itself, constitute an adequate assessment of mitigation measures that can be taken to address the energy impacts during construction and operation of the project." (*Id.* at p. 211.) **(3)** Finally, the court rejected reliance on mitigation measures adopted under the rubric of reducing greenhouse gas emissions that "would likely have the collateral effect of substantial energy-saving effects." (*Id.* at p. 207, fn. 6.) The court explained, "Although there is likely to be a high correlation between reducing greenhouse emissions and energy savings, this court cannot assume the overlap is sufficient under CEQA's study and mitigation requirements. . . . 'Air quality mitigation is not a substitute for an energy analysis.' Thus, we will not consider [the] mitigation measure . . . in our discussion of mitigation measures addressing energy impacts." (*Id.* at p. 208, fn. 6.)

The EIR certified by the city in this case in December 2013 clearly fails to meet the standards set forth in *Clean Energy, supra*, 225 Cal.App.4th 173. As in that case, the Costco EIR concludes that the project will generate 11,204 new

vehicle trips per weekday and 8,708 new trips per weekend day, but fails to calculate the resulting energy impacts of those trips. The EIR also improperly relies on compliance with the building code to mitigate operational and construction energy impacts, without further discussion of the CEQA Guidelines, appendix F criteria. Finally, as in *Clean Energy*, the city's reliance on mitigation measures designed to reduce greenhouse gas emissions is misplaced.

Recognizing the deficiencies in its EIR as made clear by the *Clean Energy* opinion, on December 3, 2014, the city adopted an addendum to the EIR. The addendum "clarifies and provides additional discussion of [p]roject energy consumption and electrical utilities." The summary to the addendum explains, "The [c]ity is clarifying its determination that 'the [p]roject would not exceed existing gas and electric supply or result in the wasteful, inefficient, or unnecessary consumption of energy' in part based on the recent court decision, [*Clean Energy, supra,*] 225 Cal.App.4th 173, which was published after the [c]ity certified the EIR. That decision held that CEQA requires a more detailed discussion of energy use than was previously understood at the time the EIR was certified. This discussion augments, but does not alter, the conclusions of the EIR regarding the effects of [p]roject-related energy usage." The statements regarding energy impacts in the final EIR, set forth above, are incorporated with "additional clarification and technical information regarding [p]roject-related energy usage and conservation features" into a single 10-page analysis of the potential energy impacts. The addendum addresses construction energy usage and concludes that project "construction would not consume a greater amount of energy in its construction phase than similar projects." The addendum also addresses operational energy usage, including energy usage associated with transportation fuel consumption, and concludes that with implementation of the mitigation measures identified in the EIR, the project "would not consume a greater amount of energy in its operational phase than similar projects."

■   Over Citizens' objection, the trial court considered this addendum in concluding that the EIR's analysis of potential energy impacts was sufficient. However, "under Code of Civil Procedure section 1094.5, courts can only review evidence that was actually before the administrative decision makers prior to or at the time of their decision." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1032, fn. 13 [280 Cal.Rptr. 478].) Accordingly, the addendum is not a part of the administrative record and cannot be considered in deciding whether the city abused its discretion in certifying the EIR.

■   Moreover, the city's subsequent approval of the addendum does not cure the prior approval of an inadequate EIR. The CEQA Guidelines authorize

the preparation of an addendum to a previously certified EIR "if some changes or additions are necessary but none of the conditions described in [s]ection 15162 calling for preparation of a subsequent EIR have occurred." (CEQA Guidelines, § 15164, subd. (a).) While none of the conditions requiring a subsequent EIR apply here,[5] section 15164 nonetheless assumes that the EIR previously certified was properly certified. The section does not authorize the retroactive correction of an inadequate EIR, based upon the consideration of which the project was approved, by providing the additional necessary information about the environmental effects of the project after the project has been approved. Section 15164, subdivision (d) provides explicitly, "The decision-making body shall consider the addendum with the final EIR . . . prior to making a decision on the project." The fact that the city considered the addendum when later approving certain replacement agreements and minor project changes does not, as the city contends, excuse the failure to consider the information contained in the addendum when approving the project itself.

■ Because the EIR, as certified, inadequately describes and discusses the energy impacts of the project, we must reverse the denial of the petition for a writ of mandate and remand the case for issuance of a writ, directing the city to set aside its certification of the final EIR, and approval of the project and to bring the energy section of the EIR into compliance with CEQA before redetermining whether to approve the project. (See § 21168.9.) We offer no opinion on whether the addendum adopted by the city complies with the requirements of CEQA for the analysis of energy impacts. As Citizens notes, the clarification and additional discussion of project energy consumption and electrical utilities included in the addendum have not been subjected to public comment. (7) Although the city is correct that recirculation is not required when an addendum " 'merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an *adequate* EIR' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1128 [26 Cal.Rptr.2d 231, 864 P.2d 502]), "recirculation is required, for example, when . . . the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless" (*id.* at p. 1130). Because the EIR certified in this case was inadequate in its analysis of energy impacts of the project,

---

[5] CEQA Guidelines section 15162 requires the preparation of a subsequent EIR if substantial changes are proposed in the project requiring major revisions of the previous EIR, if substantial changes occur with respect to the circumstances under which the project is undertaken requiring major revisions in the previous EIR, or if new information of substantial importance with respect to environmental effects, not known or which reasonably should have been known, becomes known.

recirculation and consideration of public comments concerning the energy analysis will be necessary before the EIR may be certified and the project approved.

3.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The judgment is reversed and the matter remanded to the trial court with instructions to grant Citizens' petition for a writ of mandate directing the city to set aside its certification of the final EIR and approval of the project and to bring the energy section of the EIR into compliance with CEQA before redetermining whether to approve the project. The judgment is affirmed in all other respects. Citizens shall recover its costs on appeal.

McGuiness, P. J., and Jenkins, J., concurred.

---

*See footnote, *ante*, page 256.