Filed 11/26/19; Certified for Publication 12/23/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| RUSSEL COVINGTON et al., | C080342 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV140075) |
| v. | |
| GREAT BASIN UNIFIED AIR POLLUTION CONTROL DISTRICT et al., | |
| Defendants and Respondents; | |
| ORNI 50 LLC et al., | |
| Real Parties in Interest and Respondents. | |

This case presents a California Environmental Quality Act (CEQA) challenge to the approval of a geothermal power plant to be located on federal land in Mono County. Petitioners challenge the adequacy of the Environmental Impact Report (EIR) to accurately estimate the amount of Reactive Organic Gas (ROG) emissions and to adopt all feasible mitigation measures. Petitioners also assert that the Great Basin Unified Air Pollution Control District (District) was not the proper lead agency to undertake preparation of the EIR.

1

We shall conclude that the District was the proper lead agency, and that the permit limiting the daily ROG emissions is sufficient evidence of the amount of the emissions. However, we conclude the District did not adequately analyze whether the additional mitigation measures proposed by petitioners were feasible to limit ROG emissions. We shall reverse the part of the judgment relating to the District's consideration of the proposed mitigation measures, and shall otherwise affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

This case challenges the District's certification of an EIR for the Casa Diablo IV Geothermal Development Project (Project), which is proposed by real parties in interest ORNI 50 LLC, Ormat Nevada, Inc., and Ormat Technologies, Inc. (collectively Ormat). Petitioners are Laborers' International Union of North America Local Union No. 783 (LIUNA) and certain of its individual members (collectively petitioners).

The Project is a proposed geothermal energy facility on national forest land in Mono County. The United States Forest Service manages the surface estate, and the Bureau of Land Management is responsible for management of the subsurface estate through geothermal leases. The Project will be constructed adjacent to an existing geothermal complex located within the Mono-Long Valley Known Geothermal Resource Area. The area has been developed for geothermal power plants since approximately 1984. The Project will be the fourth geothermal power plant in the area.

A joint Environmental Impact Statement (EIS) and EIR was prepared by the Bureau of Land Management, the United States Forest Service, and the District. The lead federal agency was the Bureau of Land Management. The District was the California state lead agency for purposes of preparing and certifying the EIR.

The objective of the Project is to produce commercially viable electricity from clean and renewable resources, thereby supporting California's twin goals of reducing greenhouse gas emissions and dependency on fossil fuels. The Project would work by pumping hot water from a deep geothermal reservoir, extracting the heat using heat

2

exchangers, and reinjecting the water into the reservoir to be reheated and reused. The heat would be used to vaporize the motive fluid, normal pentane (n-pentane), in a closed-loop system. The gas would turn a turbine, generating electricity. N-pentane is non-toxic, but it is an ROG, and is a precursor to the formation of ozone.

Even though the Project proposes to encase the n-pentane in a closed-loop system, it is expected that n-pentane would leak from the valves, connections, seals, and tubes of the closed system. This expected leakage is referred to as fugitive emissions. Questions surrounding these fugitive emissions are the basis of this appeal.

Petitioners argue that the District's finding that the fugitive emissions would be limited to 410 pounds per day is not supported by substantial evidence. Petitioners also argue that the District's conclusion that there are no additional feasible mitigation measures available to reduce the Project's fugitive emissions of n-pentane is not supported by substantial evidence. Finally, petitioners argue the District abused its discretion by preparing the EIR and acting as the lead agency.

The trial court denied the petition for writ of mandate, finding the District was the proper lead agency, the permit to operate conclusively set the emissions limit, and that the District properly determined that the additional proposed mitigation measures were not feasible.

## DISCUSSION

Preliminarily, both the District and Ormat argue petitioners failed to exhaust their administrative remedies, and that they cannot now use CEQA to challenge the District's permit conditions. They argue both Health and Safety Code section 42302.1 and the District's rules 200.A, 205, and 602, required petitioners to challenge the permit conditions in an administrative process.[1] We disagree.

_____

[1] Health and Safety Code section 42302.1 provides that a decision or action pertaining to the issuance of a permit by an air pollution district may be challenged

3

"Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199.) The exhaustion requirements are set forth in Public Resources Code section 21177. A petitioner has exhausted its administrative remedies if: (1) the alleged grounds for noncompliance with CEQA were presented by any person during the public comment period or prior to the close of the public hearing before issuance of the notice of determination, and (2) the party filing the CEQA action objected to the approval of the project during the public document period or prior to the close of the public hearing before the notice of determination was issued. (Pub. Resources Code, § 21177, subds. (a) & (b).) These requirements were met here.

The issue of the proper lead agency was raised by petitioners. The specific mitigation measures to reduce ROG emissions and the lack of evidence to support the daily n-pentane emissions were raised by the California Unions for Reliable Energy. Even though petitioners did not raise all of the issues they now assert during the administrative proceeding, all of the issues were raised, and the party raising an issue during the administrative process need not be the same party to raise the issue in court. (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 191.) Nothing further was required to exhaust petitioners' administrative remedies.

I

*Sufficient Evidence of Fugitive Emissions Limit*

The District adopted a threshold of significance for ROGs of 55 pounds per day for the operation of the Project. The fugitive emissions of n-pentane were calculated at 410 pounds per day, well above the threshold of significance. Prior to certification of the

within 30 days of the decision by a request that the district's hearing board hold a public hearing. District Rule 200.A provides that a written permit from the District must be obtained before building anything that emits air contaminants. Rule 205 sets forth the procedures for acceptance of an application for a permit. Rule 602 sets forth the contents required for a petition requesting a hearing before the District hearing board.

4

EIR, petitioners' counsel sent a public records act request to the District seeking documents to support the fugitive emissions estimate of 410 pounds per day. The District replied with a schematic and table with all information redacted, save the total emissions numbers. The District stated that the geothermal flow rates were considered proprietary.[2] Petitioners' counsel argued the information was improperly redacted. The District then submitted a second redacted version containing an unredacted table and a partially redacted schematic. The information was submitted after the final EIR was released, but nearly one year before the notice of determination was filed.

Petitioners argue the record does not contain substantial evidence to support the conclusion that the Project's n-pentane emissions will be limited to 410 pounds per day. They argue the record contains no facts to justify the number. They argue their own expert evidence shows that actual emissions would be 10 times greater.

Both the District and Ormat respond that the project must comply with the permit to operate, which limits the emissions of n-pentane to 410 pounds per day. Therefore, they argue, it is immaterial that there is not evidence in the record of how Ormat calculated the fugitive emissions. We agree.

---

[2]     Public Resources Code section 21160 provides that a public agency may require any applicant for a permit to submit data necessary to enable the agency to prepare an EIR, but if the information submitted is a trade secret as defined in Government Code section 6254.7, it will not be included in the EIR or disclosed by the public agency. Government Code section 6254.7, subdivision (d) defines trade secrets as: "[A]ny formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within a commercial concern who are using it to fabricate, produce, or compound an article of trade or a service having commercial value and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it." Nevertheless, air pollution emissions data, even data which constitute trade secrets, are public records. *But*, data used to calculate emissions data are not emissions data and not public records. (Gov. Code, § 6254.7, subd. (e).) Thus, emissions data are public records that must be disclosed, but data used to calculate emissions data may constitute a trade secret and be excluded from the EIR and from public disclosure.

5

Ormat's preliminary permit application is for "411 lbs[.] per day of allowable fugitive/non-fugitive emissions. Probably less when the plant is new, increasing as it gets toward the end of its estimated 30 year lifespan."[3] If there are adequate measures in place for detecting and reporting emissions and for enforcing the emissions limits, it is immaterial how the emissions are calculated because they will be within permitted limits.

The District adopted mitigation measures that are adequate for detecting and reporting n-pentane emissions. The District adopted Mitigation Measures AQ-5 and AQ-6 with respect to the n-pentane emissions. Measure AQ-5 requires Ormat to prepare and implement an emission management plan for the District's approval. The plan must: (1) describe the method for determining the daily n-pentane volume in the plant; (2) explain how to calculate n-pentane loss rates over a given period; (3) provide a procedure for detecting and reporting breakdown events, i.e., when n-pentane leaks are greater than 410 pounds per day, which procedure complies with the District's rule 403.B;[4] (4) provide a plan for repairing leaks associated with breakdown events and a

---

**3** There is no explanation by the parties of the discrepancy between 410 pounds per day mentioned in the EIR and 411 pounds per day stated in the preliminary permit application. We will assume that the final permit will be for 410 pounds per day, as stated in the EIR.

**4** District rule 403.B states: "1. The owner or operator shall notify the Air Pollution Control Officer of any occurrence which constitutes a breakdown condition; such notification shall identify the time, specific location, equipment involved, and, to the extent known, the causes of the occurrence, and shall be given as soon as reasonably possible, but no later than one (1) hour after its detections, unless the owner or operator can demonstrate that a longer reporting period is necessary. [¶] 2. The Air Pollution Control Officer shall establish written procedures and guidelines, including appropriate forms for logging of initial reports, investigation, and enforcement follow-up, to ensure that all reported breakdown occurrences are handled uniformly to final disposition. [¶] 3. Upon receipt of notification pursuant to subparagraph B(1), the Air Pollution Control Officer shall promptly investigate and determine whether the occurrence constitutes a breakdown condition. If the Air Pollution Control Officer determines that the occurrence does not constitute a breakdown condition, the Air Pollution Control

6

maintenance plan for routing monitoring and prevention of n-pentane leaks; and (5) provide a format for quarterly reports on n-pentane losses and purchases, and update the emissions management plan as necessary to ensure compliance with federal, state, and/or district rules and to incorporate improvements.

Measure AQ-6 requires Ormat to obtain a portable volatile organic compound leak detector capable of meeting the performance specifications described in the United States Environmental Protection Agency's (USEPA) "Source Test Reference Method 21," which instrument must be properly maintained, calibrated and made available on the property site. Ormat must use the leak detector at least monthly to detect leaks from all flanges, valves, pump seals, safety relief valves, accumulator vessels, and turbine gland seals. If a leak greater than 10,000 parts per million by volume (ppmv) is detected, Ormat must initiate repairs as soon as practical and must tag and log the leak's location, concentration, date discovered, and dates of each repair attempt. Ormat must provide the District a report containing the six-month average daily emission calculations and n-pentane purchases must be submitted electronically to the District within 30 days from the end of each calendar quarter. Ormat must provide the District a summary record of the leak repairs made when reporting n-pentane losses.

These mitigation measures ensure that the fugitive n-pentane emissions will be adequately detected and reported.

Additionally, there are measures in place to enforce the emissions limits. The Project is required to conform to the District requirements for controlling emissions, and Ormat must not violate the rules and regulations of the District. The District's rule 209-A (C)(1) specifically allows the amount of emissions to be established by the permit applicant's agreement to limit operations as a condition of receiving the permit.

---

Officer may take appropriate enforcement action including, but not limited to, seeking fines, and abatement order, or an injunction against further operation."

Other cases have held in similar situations that compliance with performance standards is a substitute for substantial evidence to support a finding of mitigation. In *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 887-888, the petitioners brought a CEQA challenge to a residential, retail/commercial, open space, and marina project along Oakland's estuary. The petitioners argued there was insufficient evidence to support the finding that the mitigation measures reduced seismic impacts to a less than significant level. (*Id*. at p. 903.) The court found that compliance with the building code, which was intended to promote structural safety in the event of an earthquake, as well as other regulatory provisions provided substantial evidence that the mitigation measures would reduce seismic impacts to a less than significant level. (*Id*. at pp. 903-904.) Thus, "a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance." (*Id*. at p. 906.)

Likewise in *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 418, the EIR stated that a city ordinance would be used as the performance standard for allowable noise levels, and that the project would comply with the performance standard. The petitioners argued there was not substantial evidence to support a finding of mitigation, but the court held the proponent's commitment to evaluate noise levels and comply with performance standards was sufficient. (*Id*. at pp. 413, 418.) Relying on *Laurel Heights Improvement Assn.*, this court stated: "Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1029.)

More recently the plaintiffs in *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 525, argued that mitigation measures that were enforceable through permit conditions were unenforceable. The Supreme Court disagreed, stating that the project's

8

mitigation and monitoring program placed the burden on the county to ensure that the project conformed to the conditions pursuant to which the project was approved. (*Id*. at p. 526.)

Petitioners cite *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692 for the proposition that an agency may not rely on a limit provided in a permit or regulation to avoid CEQA review. That case is inapposite. There, the EIR divided emissions during operation of a cogenerations plant into on-site emissions and secondary emissions, which resulted from traffic and the train delivery of coal. (*Id*. at p. 714.) In response to the plaintiffs' contention that the EIR's analysis of emissions was skewed because of the separation of on-site and secondary emissions, the real party in interest argued that the issuance of permits by the USEPA and pollution control district resulted in a presumption of no significant impact. (*Id*. at p. 716.) The court found the permits did not consider secondary emissions, thus the permits could not be relied upon to conclude the project would have no significant impact on air quality. (*Ibid*.) Here, there is no issue about whether the permit considers all emissions. The permit only allows 410 pounds of n-pentane emissions daily. The daily n-pentane emissions is the figure petitioners question, and the daily n-pentane emissions are precisely what the permit allows. This is not a situation where the permit does not account for all of the emissions.

We conclude that by agreeing to limit its daily emissions to 410 pounds, Ormat was not required to present evidence to support its emissions estimate. The mitigation measures are adequate to ensure the amount of emissions are detected and reported, and the consequences of violating the permit are sufficient to ensure Ormat will comply with the permitted daily limit.

9

II

*Additional Mitigation Measures*

The EIR found that ROG emissions would be significant and unavoidable, even with mitigation. The ROG emissions are almost exclusively related to the fugitive n-pentane emissions. The EIR found that the significant impact would be mitigated with the imposition of mitigation measures, but not to a less than significant level. The EIR found that no additional feasible mitigation measures were available to further substantially reduce fugitive n-pentane emissions. This finding was based on the fact that the Project would include "state of the art equipment and best available technology" to limit ROG emissions. The EIR does not define "state of the art equipment and best available technology," and comments to the EIR identified additional equipment and technology to further mitigate the fugitive n-pentane emissions. However, these additional mitigation measures were not adopted.

As is relevant here, a public agency cannot approve a project if the EIR identifies one or more significant effects on the environment, unless the agency makes a finding with respect to each significant effect that specific economic, legal, social, technological, or other considerations make infeasible the mitigation measures or alternatives identified in the EIR and makes a statement of overriding consideration with respect to the significant effects. (Pub. Resources Code, § 21081.) The statement of overriding considerations for the Project found that in spite of the unmitigated environmental impacts, the Project would result in the following benefits: (1) Supporting California's goals for reducing greenhouse gas emissions and reducing dependency on fossil fuels through the increased use of renewable energy sources; (2) supporting California's "Renewable Portfolio Standard program," which requires investor-owned utilities, electric service providers, and community choice aggregators to increase their procurement of eligible renewable-energy resources to 33 percent of total procurement by 2020; (3) providing low "GHG-emitting" base load renewable energy generation;

10

(4) creating six new long-term well-paid jobs; (5) producing 42.4 megawatts of commercially viable electricity from clean and renewable resources; and (6) reducing potential environmental impacts of plant operations by implementing a robust reporting, inspection, and monitoring program.

CEQA provides that public agencies should not approve a project if there are feasible mitigation measures that would substantially lessen the significant environmental effects of the project. (Pub. Resources Code, § 21002.) An agency may reject a mitigation measure if it finds it to be infeasible. (Pub. Resources Code, § 21081.) A feasible mitigation measure is one that is capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, legal, and technological factors. (Pub. Resources Code, § 21061.1; Cal. Code Regs., tit. 14, § 15364.)

The District found that the air quality impacts could not be reduced to a less than significant level. In support of the finding the District stated: "Based on the EIS/EIR and the entire record, this significant and unavoidable impact is mitigated with imposition of Mitigation Measures AQ-5 and AQ-6 (found on EIS/EIR pages 4.2-21 and 4.2-22), but not to a level less-than-significant. Because the project will include state of the art equipment and best available technology that would limit fugitive ROG (i.e., n-pentane) emissions, no additional feasible mitigation measures are available to further substantially reduce fugitive ROG emissions. Even with imposition of Mitigation Measures AQ-5 and AQ-6, this impact would remain significant and unavoidable."

Petitioners argue there were feasible mitigation measures available, and that the District abused its discretion by failing to adopt those measures. Specifically, petitioners argue the District could have adopted a stronger leak detection and repair (LDAR) program, and could have required low-leak or leakless technology to further mitigate the fugitive n-pentane emissions.

11

These issues were raised in the comments to the draft EIR. A lead agency must evaluate comments to a draft EIR and prepare written responses that describe the disposition of any "significant environmental issue" raised. (Pub. Resources Code, § 21091, subd. (d)(1)-(2).) Where a significant environmental issue is raised, the lead agency must address the concern "in detail giving reasons why specific comments and suggestions were not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice." (Cal. Code Regs., tit. 14, § 15088, subd. (c).) The level of detail in the response may correspond to the level of detail in the comment, so that a general response is sufficient to a general comment, but a more detailed response is needed for a more detailed comment. (Cal. Code Regs., tit. 14, 15088, subd. (c).) The EIR "must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible. [Citations.] While the response need not be exhaustive, it should evince good faith and a reasoned analysis." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029.) Finally, an agency need not "adopt every nickel and dime mitigation scheme brought to its attention or proposed in the project EIR," but it must incorporate "feasible mitigation measures" "when such measures would 'substantially lessen' a significant environmental effect." (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1519.)

A.     *Leak Detection and Repair Program*

Petitioners claim a more stringent LDAR program was feasible. Petitioners criticize the leak rate (the amount of gas particles detected to trigger repair) and the amount of time allowed for leak repair. Specifically, the LDAR program for the Project (set forth in Mitigation Measure AQ-6) requires that the leak be repaired "as soon as practical" where the leak exceeds 10,000 ppmv. Comments to the EIR included evidence showing that lowering the leak rate and increasing the frequency of monitoring are

12

effective in reducing emissions.[5]  Petitioners argue the Bay Area Air Quality Management District (BAAQMD) uses best available technology for equipment leaks, which technology requires minimization of the leak within 24 hours and repair within seven days when the leak rate is 100 ppmv for all fugitive components except pumps, for which 500 ppmv is the leak rate triggering repair.

As indicated, the proposal that a more stringent LDAR program was feasible was raised in the comments to the draft EIR.  One comment to the draft EIR was the following:  "[Air quality expert Dr. Petra Pless] also shows that additional and/or more stringent mitigation measures for the leak detection and repair program are feasible. While the Applicant's proposed BACT [(best available control technology)] measure for equipment leaks includes the 'placement of pentane-specific vapor sensors at strategic locations[,]' as well as 'leak checks, inspections, monitoring, and leak logging,' Pless finds those measures inadequate to address smaller and slow leaks and therefore not BACT for the Project.  Instead, Pless recommends the USEPA's leak detection and repair ('LDAR') regulations for petroleum refineries and chemical manufacturing facilities. The implementation of LDAR is feasible, as it incorporates the elements of the proposed inspection program with additions, such as quantification of fugitive ROG leaks with a portable analyzer."  (Fns. omitted.)

Another comment regarding the LDAR was:  "Thus, BACT for equipment leaks at CD-4 should be a leak rate of 100 ppm for all fugitive components, enforced by quarterly monitoring using [USEPA] Method 21 with minimization of the leak within 24 hours and repair within 7 days. . . .  A higher leak rate for pumps, no higher than the 500 ppm

---

[5]      Evidence was submitted that in refineries, a quarterly monitoring program with a leak rate of 10,000 ppmv will reduce emissions by 70 percent, while a leak rate of 500 ppmv with monthly monitoring will reduce emissions 95 percent.

13

specified in BAAQMD Rule 8-18, must be accompanied by an analysis demonstrating that 100 ppm is not technologically feasible or cost effective in the subject applications."

The District points to the trial court's findings to support its claim that there was sufficient evidence that no additional feasible mitigation measures were available to further substantially reduce fugitive ROG emissions. However, the trial court's finding was not that significant evidence supported the conclusion that stricter LDAR mitigation measures were not feasible. Rather, the trial court found that the mitigation measures proposed by the *petitioners* were not supported by substantial evidence. This is not the issue. The court is tasked with determining whether substantial evidence supports the District's findings. (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 349.) The relevant finding here is that no additional feasible mitigation measures were available to further substantially reduce fugitive ROG emissions.

The District argues that the BAAQMD requirements for equipment leaks are not applicable here because those requirements are for petroleum refineries and chemical plants, not geothermal plants. It is certainly relevant to the analysis that the BAAQMD standards for equipment leaks were for petroleum refineries and chemical plants. However, the expert's comments stated that the LDAR for petroleum refineries and chemical manufacturing facilities was equally feasible for the Project. The response to this comment does not explain why the stricter LDAR program would not be feasible for the Project, but merely states that the LDAR program will be "conducted per USEPA methods."

The USEPA Best Practices Guide (Guide) states: "Method 21 requires [volatile organic compound] emissions from regulated components to be measured in parts per million (ppm). A leak is detected whenever the measured concentration exceeds the threshold standard (i.e.[,] leak definition) for the applicable regulation. [¶] Leak definitions vary by regulation, component type, service (e.g., light liquid, heavy liquid,

14

gas/vapor), and monitoring interval. [¶] -Most [New Source Performance Standards] have a leak definition of 10,000 ppm. Many [National Emission Standards for Hazardous Air Pollutants] use a 500-ppm or 1,000-ppm leak definition." N-pentane is not a hazardous air pollutant. (40 C.F.R. § 61.01 (2019).) The Guide states that best practices for repair call for repairing leaks "as soon as practicable but not later than a specified number of calendar days (usually 5 days for a first attempt at repair and 15 days for final attempt at repair) after the leak is detected." Mitigation Measure AQ-6 calls for leak repairs to be initiated as soon as practical, but does not give a specified number of days as a deadline. Method 21 specifically addresses volatile organic compound leaks. (40 C.F.R. pt. 60, app. A-7 (2019).) It sets forth standards for using a portable instrument to detect volatile organic compound leaks. (*Ibid*.) It deals with equipment requirements and calibration, and sample collection methods. (*Ibid*.) It does not address leak rates or repair times.

Thus, the Guide recognizes the stricter LDAR practices for hazardous air pollutants, but allows the more lenient LDAR program adopted by the District where, as here, the emissions do not involve hazardous air pollutants. Even so, the Guide would require a maximum date for repairing leaks, and the LDAR approved by the District requires merely that leaks be repaired as soon as practical.

The point raised by petitioners and their expert is that the emissions the Project will produce will have a significant environmental effect, thus the Project should employ the stricter LDAR program that is feasible for petroleum refineries and chemical plants, and would be feasible here. The District made no attempt to show that such an LDAR program would not be feasible here. The measures proposed by petitioners do not require additional equipment–only that the leak rate triggering repair be a smaller number, and that there be an outside limit to the number of days allowed for repair. The District was required to give a good faith, reasoned analysis for not adopting the stricter LDAR program utilized in petroleum refineries and chemical plants. The stricter LDAR

15

program may not be feasible for a geothermal plant. The point is, the District made no attempt to explain why such a program was not feasible. Accordingly, there is insufficient evidence in the record to find that no further mitigation measures were feasible.

B.  *Leakless and Low-Leak Technology*

Petitioners argue there was evidence that low-leak or leakless technology was feasible. Leakless and low-leak technology involves welded connections and the use of what the USEPA calls "leakless" equipment components. "Leakless" valves "include bellows valves and diaphragm valves." "Sealless" pumps for reducing leaks include "diaphragm pumps, canned motor pumps, and magnetic drive pumps. Leaks from pumps can also be reduced by using dual seals with or without barrier fluid." Petitioners' experts also mention bellows valves, as well as graphite-packed control valves and hermetically-sealed valves and flanges.

Petitioners' evidence indicated leakless technology has been used in refineries and chemical facilities. Petitioners' experts claimed the technology would be "equally feasible" in a geothermal facility, but offered no evidence of a completely leakless existing geothermal facility. The Guide states that the use of leakless technology "may be limited by materials of construction considerations and process operating conditions."

The District's response to these comments in the administrative proceeding was: "The proposed motive fluid system does include limited leakless technology, including welded connections wherever feasible and practical (Ormat 2013). For example, pipeline runs, elbows, and transitions would be welded. Leakless technology would not be feasible or practicable for some components of the motive fluid system. For example, valves would be flanged in case they would ever need to be replaced and instrumentation would need to be threaded to allow for calibration and/or replacement."

The District's response to this argument on appeal is again to point to the trial court's findings. The trial court found that there was no evidence that leakless

16

technology has been or can be used in a geothermal plant. But again, the proper question to be answered is not whether the petitioners have presented evidence that leakless technology can be used in a geothermal plant, but whether the District presented evidence that leakless technology is not feasible in this plant.

Petitioners argue the District's response to its experts' comments regarding leakless technology is inadequate. They argue the EIR should contain a discussion of which Project components will be leakless, and how, when, and who will determine whether leakless technology will be feasible. While we do not agree that the EIR was required to contain this level of detail, more information was required than was given.

An EIR must contain a sufficient degree of analysis to enable the decisionmakers to make an intelligent and informed decision. (Cal. Code Regs., tit. 14, § 15151.) Information that leakless technology would be utilized wherever feasible was merely a conclusion, and does not present sufficient facts for an intelligent decision. The District's explanation that valves would be flanged in case they needed to be replaced and that instrumentation would be threaded to allow for calibration or replacement explains why those components could not be welded, but it does not address petitioners' point that other leakless or low-leak technology is available, such as graphite-packed control valves, bellows-sealed valves, and hermetically sealed valves and flanges. The EIR made no attempt to explain whether such methods would be used, and if not whether such methods were infeasible. This was an inadequate response to comments to the EIR. The District must give a good faith, reasoned response to these comments, indicating why such measures are not feasible.

III

*The District Was the Proper Lead Agency*

Petitioner argues Mono County, not the District, was the proper lead agency because it was "the agency with general governmental powers, such as a city or county, rather than an agency with a single or limited purpose such as an air pollution control

17

district or a district which will provide a public service or public utility to the project." (Cal. Code Regs., tit. 14, § 15051, subd. (b)(1).) Petitioner claims this tainted the entire CEQA process and invalidated the EIR.

California Code of Regulations, title 14, section 15051 sets forth the protocol for choosing the lead agency for purposes of CEQA. Where, as here, the project is to be carried out by a nongovernmental entity, "the lead agency shall be the public agency with the greatest responsibility for supervising or approving the project as a whole." (Cal. Code Regs., tit. 14, § 15051, subd. (b).) This will "normally" be the agency with general governmental powers. If more than one agency with general governmental powers has similar responsibility for approving the project as a whole, the agency that acts first will be the lead agency. (Cal. Code Regs., tit. 14, § 15051, subd. (c).)

The Project is located almost exclusively on federal land, and federal agencies have jurisdiction over the surface and subsurface impacts. When the approval process began, the agencies involved believed that the only nonfederal agency with any permit authority over the Project was the District, so the District became the lead agency under CEQA. As the project developed, it became clear that some of the pipeline would run across private property and would therefore require a use permit from Mono County.

Even though the guidelines state a preference for an agency with general governmental powers, that preference does not apply if another agency has greater responsibility for supervising or approving the project as a whole. In this case, Mono County only approved a conditional use permit for a small portion of the Project. A conditional use permit was required from Mono County for 1,500 feet of pipeline to be placed on Ormat's land. Thus, the District was a proper lead agency under the circumstances.

DISPOSITION

The judgment is affirmed and reversed in part. The case is remanded to the trial court with instructions to enter a new judgment granting the petitioners' mandamus

18

petition with respect to the District's determination that petitioners' proposed measures to lessen the significant air quality impacts of the Project, i.e., leakless and low-leak technology and a stricter leak detection and repair program, were infeasible. On remand the superior court is directed to order the District to provide a reasoned analysis supported by factual information in response to the mitigation measures proposed by the petitioners as detailed above. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278 (a)(5).)

      /s/
BLEASE, J.

We concur:

     /s/
RAYE, P. J.

     /s/
BUTZ, J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| RUSSEL COVINGTON et al., | C080342 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV140075) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| GREAT BASIN UNIFIED AIR POLLUTION CONTROL DISTRICT et al., | |
| Defendants and Respondents; | [NO CHANGE IN JUDGMENT] |
| ORNI 50 LLC et al., | |
| Real Parties in Interest and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed November 26, 2019, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

1

APPEAL from a judgment of the Superior Court of Mono County, Stan Eller, Judge. Affirmed and reversed in part.

Lozeau Drury, Michael R. Lozeau, Richard T. Drury and Rebecca L. Davis for Plaintiffs and Appellants Russel Covington et al.

Morrison & Foerster, Peter Hsiao, Miriam A. Vogel; King and Spalding, Peter Hsiao for Defendants and Respondents Great Basin Unified Air Pollution Control District et al.

Liebersbach, Mohun, Carney & Reed, James S. Reed, Richard W. Liebersbach, R. Mark Carney; Leibersbach, Carney & Reed and Richard Liebersbach for Real Parties in Interest and Respondents ORNI 50 LLC et al.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
BLEASE, J.


_____/s/_____
BUTZ, J.